**NATIONAL LABOR RELATIONS BOARD
v. ARCADE-SUNSHINE CO., Inc.**

No. 7598.

United States Court of Appeals for the
District of Columbia.

Decided Dec. 9, 1940.

Petition for Rehearing Denied Jan. 14, 1941.

Writ of Certiorari Denied April 28, 1941.

See —— U.S. ——, 61 S.Ct. 942, 85 L.Ed. ——.

Robert B. Watts, of Washington, D. C.,
and Samuel Edes, of the Pennsylvania
Bar, pro hac vice, by special leave of
court, for petitioner.

Alvin L. Newmyer, David G. Bress,
Joseph A. Kaufmann, and Irving G. Mc-
Cann, all of Washington, D. C., for re-
spondent.

Before GRONER, Chief Justice, and VINSON and EDGERTON, Associate Justices.

EDGERTON, Associate Justice.

The National Labor Relations Board petitions for enforcement of an order against the respondent, Arcade-Sunshine Company, Inc., which operates a laundry and cleaning plant in the District of Columbia. On charges filed by the Laundry Workers Cleaners and Dyers Union the Board issued a complaint, held hearings, and made extensive findings. It concluded that respondent had interfered with, restrained and coerced its employees in the exercise of the right to self-organization guaranteed by Section 7 of the National Labor Relations Act,[1] and had discharged William Jones because of union membership and activity. It therefore found that respondent had engaged in unfair labor practices within the meaning of § 8(1) and § 8(3) of the Act.[2] It ordered respondent to cease and desist from these practices, to reinstate Jones and make him whole for loss of pay, to reimburse government agencies for work relief payments made to him, and to post notices that it would cease and desist as ordered and would take the affirmative action required. Respondent contends that the findings are unsupported and that the order exceeds the Board's authority.

■ The findings rest largely on this evidence. In the summer of 1937 Laundry Workers Cleaners and Dyers Union was an independent labor organization which, under different names, had lately been affiliated with the American Federation of Labor and soon became affiliated with the Committee for Industrial Organization. During an organizing campaign in the previous winter and spring, a number of respondent's employees had joined the union. In June, about forty of its colored employees were called together by their supervisor, who said that respondent's president "had somebody to talk to us." This person proved to be Risher, a part-time employee of respondent who also worked for the president personally. The president introduced him to the employees as one of their people who would show them "the right way to go." Risher urged them not to join the union. He admitted at the hearing that he had cautioned them against haste in deciding what organiza-tion to join and had told them of "the former attitude of the American Federation of Labor toward negroes, which had not been friendly." Several days later, while the plant was being picketed, respondent's department heads and supervisors prepared and circulated a petition which read: "We, the undersigned, agree to be loyal to the Arcade-Sunshine and remain at our post under present working conditions." The names of all employees were typed on the petition. 331 out of 357 signed it.

Respondent's cashier advised Parker, a truck driver, "not to agitate the union" or try to get the drivers to join lest he lose his job. Respondent's president charged Parker with "agitating the union among the drivers." When Parker's employment had ceased, and he asked for reinstatement, the president lent him two dollars and told him to talk to the employees and keep them from joining the union. He was reemployed, on condition of abstinence from union activity. In the presence of the manager, the cashier told him "we don't want no messing around. We want you to make your mind up and play ball with the company or play ball with the union." One of the officials said to him: "If a fellow comes around and says anything about * * * the union, tell them to get out of the place and you don't want to see them."

Jones began work in 1926 as a steamer and presser. He joined the union in May, 1937. He attended meetings, distributed union circulars, and talked about the union. In June or July, respondent's president and foreman both questioned him about his membership. When he denied attend-ing a union meeting the president replied "You can't fool me; I know." The cashier, in the presence of the vice-president, asked Jones to sign the "loyalty" petition. He was one of the small minority who refused. A few weeks later the foreman discharged him. When he asked the president to reinstate him he was told, "You talk too much around here; you walk around and talk about the union."

Respondent contends that Jones was discharged for habitual drunkenness. The foreman so testified. Jones admitted that he "always did drink." The Board found that on the day of his 1937 discharge he was under the influence of liquor and could not do his work. In 1934 he was

[1] 49 Stat. 452, 29 U.S.C.A. § 157.

[2] 49 Stat. 452, 29 U.S.C.A. § 158(1, 3).

discharged, but reinstated a few days later. The foreman testified that Jones was drunk practically every day for ten years, that his usual output was about ten or twelve per cent of a fair day's work, and that the president called his attention to alcohol on Jones's breath at least four or five times a week for ten years. The president, who had full power to hire and fire, testified that during each year he told the foreman, sometimes three times a day, to discharge Jones. The Board found that this testimony of the foreman and the president showed "an obvious effort to construct a case against Jones and to cover up the real reason for his discharge."

■ The Board's findings of fact, if supported by evidence, are conclusive.[3] The evidence must be substantial, but substantial evidence means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[4] Much of the evidence on which the Board relied was contradicted; but it is for the Board, and not for us, to weigh conflicting testimony and pass upon credibility.[5] Perhaps a reasonable mind might conclude that Jones was discharged solely for intoxication, but certainly a reasonable mind might conclude that there was a connection between his union activities and his discharge. This is enough to sustain the Board's order regarding Jones.[6] Substantial evidence supports, also, the finding that respondent interfered with, restrained and coerced its employees in the exercise of their right to self-organization. It follows that, as the Board found, respond-ent engaged in unfair labor practices within the meaning of Sections 8(1) and 8(3) of the Act.

■ Respondent has posted notices that it will refrain from discouraging union membership and from interfering with the right to organize. It objects to promising to "cease and desist" as implying a confession. But clearly the posting of a cease and desist notice may tend to effectuate the policies of the Act. After some differences of opinion in the circuits,[7] the Board's authority to require such notices has been upheld by the Supreme Court.[8]

■ Another recent decision of the Supreme Court[9] requires us to strike from the Board's order the provision that respondent reimburse government agencies for work relief payments made to Jones in consequence of his wrongful discharge. In all other respects the order is valid and must be enforced.

It is so ordered.

### On Rehearing.

■ Since the Board has changed its practice, and now provides in all orders that the employer's notice shall state "that he will not engage in the conduct from which he is ordered to cease and desist," and the Board consents that the order be modified accordingly, to which respondent assents, the order herein is modified to this extent. See National Labor Relations Board v. Express Publishing Co., 61 S.Ct. 693, 85 L.Ed. ——, decided March 3, 1941.

[3] 49 Stat. 454, 29 U.S.C.A. § 160(e).

[4] Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126.

[5] National Labor Relations Board v. Elkland Leather Company, Inc., 3 Cir., 114 F.2d 221; certiorari denied Nov. 18, 1940, 61 S.Ct. 170, 85 L.Ed. ——.

[6] National Labor Relations Board v. Bradford Dyeing Ass'n, (U.S.A.) 310 U.S. 318, 330–332, 60 S.Ct. 918, 84 L.Ed. 1226 (smoking); National Labor Relations Board v. Willard, Inc., 68 App. D.C. 372, 98 F.2d 244; Hartsell Mills Company v. National Labor Relations Board, 4 Cir., 111 F.2d 291, 292.

[7] Cf. Art Metals Construction Company v. National Labor Relations Board, 2 Cir., 110 F.2d 148.

[8] National Labor Relations Board v. Falk Corporation, 308 U.S. 453, 462, 60 S.Ct. 307, 84 L.Ed. 396; National Labor Relations Board v. Bradford Dyeing Association, 310 U.S. 318, 322, 60 S.Ct. 918, 84 L.Ed. 1226; National Labor Relations Board v. Elkland Leather Company, 3 Cir., 114 F.2d 221, 225, certiorari denied Nov. 18, 1940, 61 S.Ct. 170, 85 L.Ed. ——. The petition for certiorari in the Elkland case urged this point. 9 U.S.L.W. 3115.

[9] Republic Steel Corporation v. National Labor Relations Board and Steel Workers Organizing Committee, Nov. 12, 1940, 61 S.Ct. 77, 85 L.Ed. ——.