GAMBLE–ROBINSON CO. v. NATIONAL LABOR RELATIONS BOARD.

No. 12183.

Circuit Court of Appeals, Eighth Circuit.

July 17, 1942.

Thomas P. Helmey, of Minneapolis, Minn. (James E. O'Brien and Clyde W. Fiddes, both of Minneapolis, Minn., on the brief), for petitioner.

Jack G. Evans, Atty., National Labor Relations Board, of St. Louis, Mo. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, Leonard Appel, and William T. Whitsett, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before GARDNER, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

This is an appeal by Gamble-Robinson Company, petitioner, from decision and order of the National Labor Relations Board, pursuant to Section 10(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S. C.A. § 151 et seq.

Petitioner is a corporation engaged in the wholesale fruit and vegetable business having branches in seven states, and the order here involved concerns its branch at Fargo, North Dakota. The business is concededly interstate and subject to the National Labor Relations Act.

The proceedings before the Board were commenced by charges and amended charges duly filed by General Drivers' Union, Local 116, of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of American, affiliated with the American Federation of Labor, hereinafter called the Union, upon which the National Labor Relations Board issued its complaint against petitioner. Pursuant to this complaint a hearing was held before a trial examiner. The trial examiner issued his intermediate report after hearing wherein he found that petitioner had engaged in unfair labor practices within the intendment

of Section 8(1) and (3) and Section 2(6) and (7) of the Act.

The petitioner filed exceptions to the intermediate report upon which hearing was accorded by the Board. It found the exceptions to be without merit and the decision and order are in accord with the report and recommendations of the examiner.

The Board found that the petitioner interfered with, restrained and coerced its employees in the exercise of the right guaranteed in Section 7 of the Act; that petitioner discriminatorily discharged employee Carroll Dietz because of his union membership; and that the petitioner discriminatorily refused to take back its employee Ernest Remboldt because of his union membership.

On these findings the Board ordered petitioner to cease and desist from various acts which were held by the Board to be interference, restraint and coercion in violation of Section 8(1) and (3), to post certain prescribed notices, to reinstate the two employees and to make them whole for loss of pay.

The record discloses, and it was found by the Board, that the union unsuccessfully sought to organize the employees at petitioner's Fargo branch in October, 1937, while a strike was in progress among the transfer employees of another local concern. According to testimony credited by the Board, W. L. Halgren, petitioner's vice president and division manager, addressed a meeting of the employees in 1937 and at that time told them that he had belonged to the union once and he found that "it wasn't doing him any good so he dropped out", and that the men who did join the union would always be truck drivers and laborers and never have any chance for advancement.

The evidence further shows that one David C. Cook, manager of the Fargo branch, spoke against unionization. In addressing a meeting of employees, he said, "it would be pretty hard for us to be loyal to two groups." Cook also announced after the attempt to unionize failed in 1937 that "he appreciated the way the boys had stood up for the company and that we would reap our rewards for doing so." In 1938 Cook advised an employee against joining the union on the ground that he would be "better off without it", stressing the facts that the employees would be paid as much as union men and would have no dues to pay.

The Board found on conflicting evidence that all of the statements as shown above were reiterated by Cook at various meetings in the years 1938–1939.

In addition, several employees testified that Cook asked them about their union ideas and affiliations at the time they were employed, and in one instance told an employee that "all the boys were very well satisfied there without belonging to any * * *."

There is much testimony to the effect that statements were made at various times by foremen which were of much the same tenor as those set out, but on February 18, 1940, eleven of petitioner's 21 warehouse employees and truck drivers signified their adherence to the union. Petitioner knew of this immediately because the men wore their union buttons to work. The evidence discloses that one George Putz, day foreman of the warehouse, said to one of the new union men, "What did you do it for?" and then warned, "Up to now you fellows have had it pretty much your own way but from now on it is going to be hell to pay", and to two new union truck drivers Putz said, "You know we could close the house, you know, overnight here if we wanted to, pull those trucks off the road."

The petitioner urges that the foregoing facts do not justify the decision of the Board in finding that petitioner restrained, interfered with, and coerced its employees in the exercise of the right guaranteed in Section 7 of the Act.

■ It is urged that the remarks of petitioner's supervisory employees are not imputable to petitioner. In the case of International Association of Machinists, etc., v. National Labor Relations Board, 311 U.S. 72, loc. cit. 80, 61 S.C. 83, loc. cit. 88, 85 L.Ed. 50, the court said: "The employer, however, may be held to have assisted the formation of a union even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of respondeat superior. We are dealing here not with private rights (Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738) nor with technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible. Thus where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates."

Applying the controlling declarations of the law, we conclude that the Board was fully justified in attributing the remarks of Halgren, Cook and Putz to the petitioner and that substantial evidence sustains the inference drawn by the Board from the facts found by it. Also see Wilson & Co., Inc., v. National Labor Relations Board, 8 Cir., 123 F.2d 411.

■ It is also contended by petitioner that even if the statements of their employees are imputed to them they fail to constitute interference, restraint and coercion. This question of fact, which is for the Board to determine from all of the evidence, has been properly disposed of by it. When supervisory employees make the statements to employees that a union doesn't do any good; that an employee cannot be loyal to an employer and a union at the same time; that employees will be money ahead by not joining the union; that it is not necessary to pay tribute to an outsider; that those who join the union would always be truck drivers and laborers and never have any chance for advancement; and then after the employees have joined the union declare that the company could close down the shop and pull the trucks off the road; that it will be hell to pay now, there is substantial evidence for the Board to find that the employees have been interfered with, restrained and coerced, first having determined that the statements were imputable to or made by the employer. See National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L. Ed. 368; International Association of Machinists, etc., v. National Labor Relations Board, supra; National Labor Relations Board v. Waterman S. S. Corp., 309 U.S. 206, 60 S.C. 493, 84 L.Ed. 704; National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

.From the above statements covering a period from 1937 to 1940, reiterated time after time, it is apparent that the employees would realize that the employer was actively opposed to unionization. Especially is this conclusion inevitable when it appears that upon hiring new employees they are asked about their association with or ideas concerning unions. The decision of the Board as to interference, restraint and coercion is supported by substantial evidence.

We conclude also that petitioner's contention that to sustain the Board's findings as to interference, restraint and coercion would violate petitioner's constitutional right to freedom of speech is met by the declarations of the Supreme Court in National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, loc. cit. 477, 62 S.Ct. 344, loc. cit. 348, 86 L.Ed. ——. The court there said, "Neither the Act nor the Board's order here enjoins the employer from expressing its view on labor policies or problems, nor is a penalty imposed upon it because of any utterances which it has made. The sanctions of the Act are imposed not in punishment of the employer but for the protection of the employees. The employer in this case is as free now as ever to take any side it may choose on this controversial issue. But certainly conduct, though evidenced in part by speech, may amount in connection with other circumstances to coercion within the meaning of the Act. If the total activities of an employer restrain or coerce his employees in their free choice, then those employees are entitled to the protection of the Act. And in determining whether a course of conduct amounts to restraint or coercion, pressure exerted vocally by the employer may no more be disregarded than pressure exerted in other ways. For 'Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure.' "

### Discharge of Dietz.

The Board found on substantial evidence that Carroll Dietz was employed by petitioner on August 6, 1937, as a warehouseman, and continued in that capacity until discharged on April 14, 1940. Prior to this employment he had worked as a shipping clerk in a grocery store in Missoula, Montana, and had wrongfully taken merchandise and money of his employer for his own use. He had made restitution by giving a note for $500. Shortly after being employed by petitioner Dietz was required to make application for a bond, and upon receiving the application he went to Mr. Cook, petitioner's general manager, and told him the essential facts concerning the matter. Cook replied that this was a "black blot" on Dietz's name but since Dietz had told him, he would have more confidence in him. In filling out his application Dietz gave his former employer, from whom he had taken the money, as a reference, and some time later this man wrote to Dietz and asked him what he should do in regard to giving a letter to the bonding company. Dietz again went to Cook for advice as to what to write the former employer and Cook gave him advice in the matter. Some time later Cook told Dietz that the matter of the bond was all right. It was also found that Dietz had said to Cook that he had developed an inferiority complex over the matter, to which Cook replied, "You don't need to have at all. * * * I trust you more than I do any man on the night crew."

On February 18, 1940, Dietz joined the union, and went to work that night wearing his union button. The next morning Putz, a foreman, said to him, "What did you do it for?" and after Dietz's explanation, said, "I will tell you, up to now you fellows have had it pretty much your own way, but from now on it is going to be hell to pay."

Some few days after Dietz had joined the union, Cook said to him, "What have you to say to me?" Dietz replied, "Nothing that I know of." Cook then told him that he had information that Dietz's bond wouldn't go through. Dietz asked Cook if his honesty was questioned and received a negative reply. On this occasion Cook made this statement: "Join the Kiwanis or anything else you want to but remember, Dave Cook is still the manager." A week or so later, Cook said to Dietz after Dietz had asked him if he would be laid off, "Well, I will tell you Carroll, you play ball with me and I will play ball with you."

A short time later Cook wrote to Mr. Halgren, the petitioner's division manager, and advised him as to those of the employees who had joined the union. Cook at this time also advised Halgren of Dietz's past record. Cook and Halgren then decided to write to one of the petitioner's branch managers in Missoula, Montana,

and have him investigate Dietz's record there. On March 13, 1940, a letter was received by Cook which read in part:

"Your letter of March 11th just received in reference to Carroll M. Dietz. This party did work for H. L. Haines clerking, in one of his retail stores, in fact I knew this party myself. His record with Haines is very bad, at the time he left Haines employ I heard he had been caught stealing.

"I just had a talk with Mr. Covey, manager and righthand man for Harry Haines, and he confirmed this report. He stated this party stole several hundred dollars from them; how much they will never know, and in addition a lot of merchandise, cigarettes, hams, etc.

"He says this party is very clever the way he operates, but is nothing but a crook.

"Do not believe I ever made a report like this on anyone, but if you have this party in your employ, it certainly is to the company's good that you have the correct information at once."

Immediately Cook conferred with Halgren and reported the matter to one Corbell, the petitioner's personnel manager. Corbell came to the Fargo branch on April 6 and advised Cook not to take Dietz back (Dietz had been sick) until so advised, and also to send Dietz's personal file to him. Corbell then went back to Minneapolis and there talked with a representative of the bonding company, giving the facts concerning Dietz. On the afternoon of April 14, 1940, Cook went to Dietz's home and informed him that he was discharged and that his bond was being cancelled.[1]

The petitioner contends that Dietz was discharged because there was a shortage of some $1,600 shown by petitioner's 1939 financial report. Petitioner's position on this matter is that when it discovered the shortage it checked back on the references of its employees and then found out about Dietz and therefore the discharge was justified. But this explanation does not accord with the facts shown. When petitioner's 1939 financial report was prepared a check was made to find shortage, but to no avail. Cook did not even think it advisable to disclose Dietz's record at that time, which was before his union affiliation. It was not until soon after Dietz did join the union that his record was disclosed. The conclusion

of the Board must be viewed in connection with the evidence of the anti-union activity of petitioner, together with the facts that the consideration of Dietz's record came at the same time that Halgren asked Cook for a list of the union men. Important, too, is the fact that Cook told Dietz that he was the most trusted man on the night shift and all the officers and foremen of petitioner testified that there was no basis upon which to assume that Dietz had any connection with the shortage.

Cook knew of Dietz's record in the fall of 1937. The petitioner admits that Dietz's record with it shows him to be an honest employee for a period of 2½ years, with two raises given him by petitioner during that period. The record further affords grounds for the conclusion that Dietz was in fact discharged to undermine the precarious majority which the union had, and that the ostensible ground of discharge was not the real and actual one on which petitioner acted.

Though discovery by an employer of a record of peculations committed by an employee in the past in another employment may cause the employer to immediately order discharge of the offender from his employment, we may not declare that whenever the employer can produce such a record against an employee whom he has discharged all inquiry as to the cause of discharge shall be foreclosed. Such declaration would find no support in the Act. Rehabilitation of past offenders finds sanction both in law and in common practice. Admissions of the petitioner itself put it beyond question that Dietz long performed his work as a loyal employee and that there had been some condonation with notice of past offending. Fully recognizing that the evidence might well have led the Board to a different finding, it is not for the court to make a substitution.

In National Labor Relations Board v. Blanton Company, 8 Cir., 121 F.2d 564, loc. cit. 570, this court said: "This evidence, which the Board in its powers under the statute had a right to credit, and other facts connected with the situation from which confirmatory inferences also could properly be derived, gave the Board the right to determine whether there had been a refusal to reinstate for present proper causes, or

---

[1] The letter from the bonding company announcing the cancellation of the bond was dated April 18, 1940, but Corbell testified that Dietz was discharged upon the information received from Montana and not just because of the bond.

whether, even if proper causes existed, they did not in fact induce the refusal to reinstate, but were, as the Board expressed it, merely 'a justification of it in retrospect'. See N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 46, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. We think the conclusion of the Board was warranted under the evidence." Also see N.L.R.B. v. Arcade-Sunshine Co., Inc., 73 App.D.C. 128, 118 F.2d 49; Hartsell Mills Co. v. N.L.R.B., 4 Cir., 111 F.2d 291. In the latter case the court said (111 F.2d loc. cit. 292, 293): "In view of the fact that petitioner retained Love in its service notwithstanding the circumstances which it now urges as justification for his discharge, that it gave as reason for the discharge a comparatively trivial criticism of its policy and that it discharged him so soon after his election as head of the local chapter of the union, which it was anxious to be rid of, we cannot say that the finding of the Board is not substantially supported by the evidence. It must be remembered, in this connection, that the question involved is a pure question of fact; that, in passing upon it, the Board may give consideration to circumstantial evidence as well as to that which is direct; that direct evidence of a purpose to violate the statute is rarely obtainable; and that where the finding of the Board is supported by circumstances from which the conclusion of discriminatory discharge may legitimately be drawn, it is binding upon the courts, as they are without power to find facts or to substitute their judgment for that of the Board."

█ We think that the finding of the Board that the discharge of Dietz was motivated and ordered because of his union activities was at least a rational and permissible deduction from the facts set forth above and from the other facts relating to the company's anti-union attitude and must be sustained. N. L. R. B. v. Nevada Consolidated Copper Corp., 62 S.Ct. 960, 86 L.Ed. ——, decided April 27, 1942.

### Remboldt.

Ernest Remboldt, a truck driver, was employed by petitioner on October 1, 1938. Theodore W. Hoofer, another truck driver who was resigning to operate a hotel, introduced Remboldt to petitioner. At the time that Cook hired him he was questioned about unions and said to Cook: "No experience at all before with any unions and * * * didn't know what they were like."

Remboldt was laid off on April 15, 1940, when certain road restrictions became operative requiring petitioner to take their trucks from the road. Remboldt was told that he would be put back to work as soon as the restrictions were lifted. In reliance upon this understanding Remboldt reported back to work about the middle of May but was not given his job back.

In the meantime Hoofer, his predecessor, had been employed and put back on Remboldt's job.

Petitioner contends that the reason Hoofer was given Remboldt's job was that at the time Remboldt was hired there was an understanding between all parties concerned that Hoofer could have his job back if he wanted it.

█ The Board found upon substantial evidence that there was no such arrangement, and since the Board must make the findings of fact under the Act, we must take it as true.

Part of the evidence given by Hoofer upon which the Board reached its conclusion is as follows:

"Q. What gave you the impression that you could get the same job back if you decided to quit the hotel business? A. Because that is the job I wanted back.

"Q. Well, you don't always get the job you want, do you? A. I did.

"Q. Well, I know, but what gave you the impression at that time that you could have the job that you wanted back whenever you wanted it? A. I don't know."

There is also corroborative evidence in the letter which Cook wrote in reply to Hoofer's letter for reinstatement.

"Yes, Ted, we have been thinking of you frequently and are very pleased to know that you will be interested in coming back with us. It will be a matter of another month before we will have things opening up so that we will be operating in full force. We would rather you wait until then if you can.

"We might tell you that if things break a little sooner than we expected we will be more than anxious to get a hold of you."

It is important to note that there was no mention made of any arrangements such as is contended by the petitioner.

█ Therefore it is the opinion of this court that the Board's decision that the discharge of Remboldt was because of his union affiliation was based on substantial

evidence. The same considerations stated in regard to Dietz apply here as near as may be.

There is no issue raised as to the form of the Board's order. It is in the form sanctioned by precedent. Enforcement thereof is ordered by this court.