## NATIONAL LABOR RELATIONS BOARD v. AMERICAN TUBE BENDING CO.

### No. 196.

Circuit Court of Appeals, Second Circuit.
April 5, 1943.

Howard Lichtenstein, Asst. Gen. Counsel, Robert B. Watts, General Counsel, Ernest A. Gross, Associate General Counsel, and Joseph B. Robison, and Irene R. Shriber, Attorneys, National Labor Relations Board, all of Washington, D. C., for petitioner.

Arthur L. Corbin, Jr., of New Haven, Conn., for respondent.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

This case comes before us on motion by the Labor Board for an order to enforce one of its orders, passed on September 18, 1942. The respondent raises only one question: whether a letter sent to all its employees on its stationery and signed by its president on November 28, 1941, and an address delivered by the president to all the employees on December 1, 1941, constituted unfair labor practices and justified the Board's order directing it not to interfere with or coerce its employees in their right of collective bargaining. We have annexed at the end of this opinion copies of the letter and of the speech, but it is necessary also to give the setting in which they were uttered. On October 13, 1941 a local of the American Federation of Labor, filed a petition with the Regional Director for the Second Region, asking an investigation and certification of the proper bargaining representative of the respondent. On November 18, 1941, the Board directed an election by secret ballot to determine whether the employees should be represented either by the A. F. of L. local, or by an unaffiliated union of the employees, or by no union at all. On December 2, 1941, the election took place under the direction of the regional director, and on the 4th she reported that the majority of employees had voted against both labor organizations: 413 votes were cast out of a possible 417, of which the employees' union received 28, the A. F. of L. local 105, and 280 were cast against any union. The speech which we have mentioned was read by the president from a written manuscript on the eve of the election to three shifts of employees assembled in the factory: the first and second shifts of 420 employees he addressed at 3 p. m., and the third shift of 60, at 11:00 p. m.

The foregoing constitutes the whole record. The question may be divided into two parts: first, whether the statements in the letter and the speech uttered at that time and under those circumstances could be regarded as coercive at all; second, if so, whether they were privileged under the First Amendment. Had it not been for the decision of the Supreme Court in National Labor Relations Board v. Virginia Electric & Power Company, 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348, we might have considered some of that court's earlier decisions as requiring us to grant an enforcement order in the case at bar.

Those decisions might be interpreted as holding that any address or other communication from an employer made directly to his employees may have, and ordinarily will have, a double aspect: on the one hand, it is an expression of his own beliefs and an attempt to persuade his employees to accept them; on the other, it is an indication of his feelings which his hearers may believe will take a form inimical to those of them whom he does not succeed in convincing. Insofar as it is the first, the Constitution protects him; insofar as it is the second, it does not. The Board, being composed of those especially versed in the subject matter, must decide how far the second aspect predominates, and if they conclude that it will seriously coerce the employees' freedom of choice, they may forbid it.

The Virginia Electric & Power Company had had a history of anti-union activity of which the bulletin and the speech which were the subject of the decision were parts. The occasion of their utterance was an effort by the A. F. of L. to organize the company shortly after the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., had been declared constitutional, and while an unaffiliated union was in process of formation in the plant. The bulletin recognized the right of the employees to join any union, but said that none of them need do so. It declared that campaigns of national labor organizations had often resulted in strikes and unrest and that the company, for the fifteen years during which there had been no union, had had happy relations of mutual confidence and understanding with its employees. It was always willing to discuss its affairs singly or collectively with any of them, and would continue to do so; the interests of both would best be promoted by confidence and cooperation. There can be no question, we think, that the Board was justified in considering this as an argument, scarcely a concealed argument, against unions, at least against national unions. In the speech the employer said that some of the employees had asked for collective bargaining, but that in dealing with wages and labor conditions it must have an eye to the interests of all the employees. In conformity with the spirit of the act all interested groups should be represented. The company was willing to bargain as the majority might decide, and would not retaliate against any because of their affiliations. Nevertheless some petitions which

it had received **had** disclosed that those who presented them **wished** to do their own bargaining and the company was content so to proceed. If the employees would set up an unaffiliated union, that would make it easier to bargain in that way. From this the Board might also have concluded that the employer was advocating the formation of an unaffiliated union.

The court reversed a finding that the employer had used coercion in uttering these two statements. It assumed, though it did not expressly so decide, that, taken as parts of the whole "complex" of circumstance—past and present—they might have supported a finding of coercion; but it was doubtful whether the Board had not based its action upon them alone, without taking them as a part of all the company's dealings with its employees. So isolated, the court found "it difficult to sustain a finding of coercion" founded upon them, page 479 of 314 U.S., page 349 of 62 S.Ct., 86 L.Ed. 348. What the employer had said "set forth the right of the employees to do as they please without fear of retaliation," and that protected his utterances except as they might be altered by "imponderable subtleties at work." As it appeared that the Board had "rested heavily" on the bulletin and speech, "the adequacy of which we regard as doubtful," it must reconsider the case as a whole.

■ In spite of a little ambiguity thrown upon the reasoning by the words last quoted, the conclusion seems inevitable that the court did not believe that the bulletin and the speech would alone support a finding of coercion. Possibly it so concluded because they could not have in fact coerced the employees; but we do not so understand it: the employer had raised his privilege and we read the decision as sustaining it. But it makes no difference which view we take: whether there was not enough evidence of coercion, or whether, though there was, the utterances were privileged: in either event, without more they did not support the finding. The only question here is therefore whether the respondent's letter and speech were different enough to count. We shall not go over them in detail; they appear to us to be substantially the same in their general tenor and purport. The respondent professed itself willing to abide loyally by the results of the election, but did not conceal, though perhaps it made some effort to disguise, its preference for no union what-

ever. But there was no intimation of reprisal against those who thought otherwise; quite the opposite. The most that can be gathered from them was an argument, temperate in form, that a union would be against the employees' interests as well as the employer's, and that the continued prosperity of the company depended on going on as they had been. It seems to us extremely undesirable, particularly in so highly charged a subject matter, to draw fine-spun distinctions between two situations so closely alike; any we could make would be insubstantial refinements without real significance; would promote controversy and exacerbate, where the purpose should be to assuage. If there was a basis for finding that such a presentation of the employer's side might be a covert threat to recalcitrants, there was as much basis in the Virginia case. If on the other hand the employer's interest in free speech in the Virginia case was thought to outweigh an actual prejudice to the employees' right of collective bargaining, the employer's interest is the same in the case at bar and the employees' prejudice no greater. We can find no tenable distinction between the two.

■ We should remand the cause to the Board, as the Supreme Court did in the Virginia case, if the record contained anything else than the letter and the speech together with the occasion—a coming election—on which they were uttered. It does not, and the occasion was for all practical purposes indistinguishable from the occasion on which the bulletin and speech were uttered in the Virginia case. If we were to remand, there would therefore be nothing which the Board could do, unless it were to conduct a further hearing, which we do not understand that it wishes to undertake. Hence it seems to us that we have no alternative but to reverse the order and dismiss the proceeding.

Order reversed; proceeding dismissed.

### Letter Addressed to Employees
on November 28, 1941

"To our Employees:

"Next Tuesday will be an important day for all of us, and so I wish it were possible for me to sit down and write each of you a personal letter about the election to be held in our factory on that day. But if you all receive the same letter it is only so because time prevents my doing anything else. If there are matters not quite clear

to you I hope this letter will help to explain some of them at least.

"This is an election to determine whether all of you will have for your exclusive bargaining agent the American Tube Bending Company Employees Cooperative Association, or Local 420 of the International Association of Machinists A. F. L., with the sole and only right to represent you in matters regarding wages, working conditions, and other things, or whether you want to continue as we have been doing, discussing your own matters individually, with neither union to represent you.

"This election will be by secret ballot, and as nearly as possible will be conducted like our town and city elections. No one can know, by any means, how you vote. The outcome of the election will be determined by a majority of those voting, which means that if more than half of those voting, choose one or the other of the unions, that union has the say for all. This is different from a majority of those entitled to vote, so Be Sure to Vote so that the election will really show your wishes, and remember that if you do not vote it is the same as letting someone else decide who will represent you. A failure to vote is almost the same as a vote for the choice you do not want.

"Some of you may wonder, if your preference as expressed at any time in the past must govern how you vote on Tuesday. It does not have to do so. This election is by secret ballot so that you can record your vote as to how you feel today, without fear or favor. You have the right to vote in accordance with your own desires regardless of whether or not you belong to any group, or whether or not you signed an application card, authorization, or anything else.

"I do not know what either the Employees Association or the Machinists Union desire, for I never have heard from either of them, but I do know that the Company has established rates which, job for job, are higher than the average in New Haven, and that the newer employees are being brought up to these rates as fast as they learn the work efficiently on their own jobs. These rates are as high as we can pay at present and still bring in the orders for all to work on. I know also that each of you can have a sympathetic hearing for your own personal problems, and adjustments are made that are fair all round. And finally I know that where

individual rate increases have been granted, more than 9 out of 10 have been granted by the company before they were asked for.

"One more thing I would like to suggest. This is an important election. For many of us it is the most important one we have ever voted in. It bears directly on your welfare and that of those dependent on you. To what kind of leadership are you going to entrust your future with the company? Is it unselfish or is it not? Is it interested in your personal, individual, welfare, or is it self-seeking? On the basis of its past record is it open and above board and dependable, or don't you know? These are questions you should think about and talk over at home.

"And now I'll close with the only promise I have ever made you. In the past your company has tried to play the game with all the cards on the table, and for the best interests of all concerned. Whatever the election on Tuesday decides, your company will still continue to play the game, knowing that the best interests of the American Tube Benders and the American Tube Bending Company are just the same.

"Sincerely yours,
"H. W. Jones, Jr., President"

Speech Delivered to Employees
on December 1, 1941

"Some of you have asked that I call you together to explain the election which will be held in the plant tomorrow. On the bulletin boards are notices of the election and also a notice which describes employees' rights under the National Labor Relations Act and also describes unfair labor practice. I am reading you this talk particularly in view of being able to prove if necessary that in the talk to you this afternoon I have not committed an unfair labor practice.

"The notice of election describes how it shall be conducted. The check lists, which are just like voting lists at regular political elections, have been prepared by the company, and agreed to by both the Employees Association and the Machinists Union. As you come up to the polling place you will find a representative of the National Labor Relations Board, the company and both unions with these check lists, and you will be asked to give your name and check number so that you may be checked off the list when you have voted. The representative of the Labor Relations Board

will give you a ballot which you will take to one of the voting booths where you will mark it in complete privacy and then you will deposit it in the one and only ballot box provided for the election. This box will remain unopened until the polls are finally closed at 11:45 at night. You will notice that there are little squares, sometimes called boxes, on the ballot. Your choice will be made by marking 'X' in the square to represent your wishes. You can, therefore, see that the election will be conducted in a fair and impartial manner and will give you absolute freedom to express your choice without any coercion.

"Twice before when I have talked to all of you I have stated the company's position regarding the open shop, and I again repeat it to you, that this is an open shop in a true sense of the word. Members of labor unions and non-members of labor unions are employed without any discrimination whatsoever, and so long as I am connected with the management of this company the policy will continue.

"What then is the issue and why are we having an election tomorrow. It all boils down to this. Can one or the other union get more for you than you can get in any other way? Of course the important thing that all of us are thinking about is wages, so let's talk about them a little.

"Where do they come from? They come from the money received from the sales of our product to our customers all over the country, and in order that sales may be made to provide the money for wages, we must be very careful how we set the price of our product. If the price is too high, we lose orders. If the price is too low, we lose money, and in either way the money for wages is not there. Right now the company is engaged in a very delicate and ticklish operation of raising the prices of our product to our customers in order to allow us to continue our present wage policy and at the same time keep the business coming our way and not throw it into the laps of our competitors.

"And so you have a right to know, I believe, just what is the company's wage policy. This is it. Our wage policy is to pay wages better than the average for equivalent jobs in this locality. It is to pay wages as high as possible and still continue able to sell our product, get repeat orders, and keep as many people employed as we possibly can. Finally it is to pay wages as high as possible and keep the business sound financially so that when a period of slack time comes we will have a strong company and be able to go out and fight for the business that is going to be so hard to get at that time.

"What has been the record of the company in the past on wages? You as employees should know better than anyone else. As I told you before, we have rated the jobs according to the best available scientific plan, and as I said before, anyone who wants to see how that is done, can learn exactly how it's done by talking with Mr. Hanabury, Mr. Kingsbury, Mr. Smith or myself. We have voluntarily increased individual rates as quickly as you have earned them and as quickly as we could pay them. Your choice now is whether or not you can better the record. Furthermore, our wage rates now are flexible, and some of you have had as many as four increases in a year, but I call attention to the fact that under a collective bargaining contract wage rates usually tend to be established for a period of a year, and this may interfere somewhat with the personal contact we have had regarding individual rates and may interfere with the recognition of improvement. Lastly regarding wages, if you decide to have someone represent you, you have got to make up your minds to be willing to pay for that representation.

"So when it comes to the final analysis, fellows, you are voting on who you want to have for your leader. You have three choices. First on the ballot is a choice for some of your fellow employees in the Employees Association. Second on the ballot are outside people having no connection with the plant, and working with a committee of employees. These are the Machinists Union. Finally the last choice on the ballot is the present management of your company.

"You have to ask yourselves whether or not your fellow workmen, no matter what fine fellows they are, can do more for you than you have been able to do heretofore for yourselves? You have to ask yourself why it is that total strangers all of a sudden become so interested in your welfare? Who are they? And what have they done? And what more can they do for you than you have already done for yourself? You have to ask yourself whether the management of the company that built this factory, that bought material, that bought machinery and that provided these jobs, you

have to ask yourself, I say, whether or not this management is best for you in the long run. You have to decide whether your interests and the company's are the same, or whether your interests and those of either union are the same. In other words, fellows, it boils right down to this. Is your status under my leadership something that you can improve by choosing someone else for your leader?

"Now this has been going on for more than a year, and the matter is coming up for a decision tomorrow. When it's all over we don't want any question as to how all of us feel. Americans, ever since the Declaration of Independence, and even before that, have settled questions like this by going to the polls, and voting secretly exactly as they wished. Let's make this election really represent the choice of everyone. Remember that unless you vote, your failure to do so may bring about a result that you would not like to have. It takes one more than half of all those voting to decide.

"So I urge you most earnestly to vote tomorrow.

"H. W. Jones, Jr."