## PETER J. SCHWEITZER, Inc., v. NATIONAL LABOR RELATIONS BOARD.

### No. 8698.

United States Court of Appeals District of Columbia.

Argued June 6, 1944.

Decided July 10, 1944.

Mr. Roy Plaut, of New York City, member of the Bar of the Court of Appeals of the State of New York, pro hac vice, by special leave of Court, with whom Messrs. Arthur E. Reyman, of New York City, and Homer Hendricks, of Washington, D. C., were on the brief, for petitioner.

Mr. Alvin J. Rockwell, General Counsel, National Labor Relations Board, of Washington, D. C., with whom Mr. Malcolm F. Halliday, Associate General Counsel, National Labor Relations Board, of Washington, D. C., was on the brief, for appellee. Mr. Howard Lichtenstein, Assistant General Counsel, National Labor Relations Board, of Washington, D. C., entered an appearance for appellee.

Before GRONER, Chief Justice, and EDGERTON and ARNOLD, Associate Justices.

ARNOLD, Associate Justice.

This case comes before us on a petition to review an order of the National Labor Relations Board to cease and desist from interfering with or coercing petitioner's employees in their attempt to unionize. The order requires the following affirmative action: Petitioner is required to mail to all its employees notices stating that it will not engage in the conduct from which it

is ordered to cease and desist, and to post immediately in conspicuous places in its plant notices to the same effect. The petitioner contends that in making this order the Board has ignored the constitutional right of free speech, and further, that there is no evidence to support the findings of coercion and anti-Union conduct.

The order to cease and desist does not specify the particular things which the Board considers unfair labor practices and which the petitioner must refrain from doing. However, under the heading "Interference, restraint, and coercion" a number of the defendant's acts are criticized. It would appear from the specific findings of fact on which the order is based that the Board is complaining about two things. First, that the petitioner used its policy of generous and liberal treatment of employees for the express purpose of convincing them that there was no need for a union in the plant. This type of persuasion is found in interviews with particular employees who were prominent in the union movement. It was finally brought home to the employees as a whole in a letter distributed the day before the election listing the benefits voluntarily given by the company and asking the employees to check up to see whether their union friends in other plants were getting such liberal treatment.[1]

The second ground of the Board's com-

---

[1] The full text of the letter is as follows:

"To Our Employees:

"Next Friday will be an important day for all of us. What I am about to tell you now I would have preferred to say personally, but because of the difficulty of getting all of the shift workers together, I am forced to do the next best thing and that is to write to you.

"On Friday there will be an election to determine whether you want the American Federation of Labor to have the right to represent you in regard to wages, working conditions, etc., or whether you want to continue the way we have been doing. Your Company recognizes the right of every employee to join any union that he may wish to join and such membership will not affect his position with the Company. On the other hand, we feel that it should be made clear to you that it is not necessary for you to join any labor organization if you do not want to. This election will be by secret ballot. No one can possibly find out how you vote. The election will be decided by the majority of those *voting*, so BE SURE TO VOTE, even if it happens to be your day off, or you are on vacation.

"Some of you may wonder if the fact that you signed some card distributed by the union requires that you vote for the union. The answer is no. You have the right to vote exactly as your conscience tells you to at the time that you are voting. Let me repeat again. *The ballot is secret and no one can possibly know how you voted.*

"I do not know what you have been promised by others. I do know that for over twenty years we have enjoyed the most pleasant relationship with our employees. As Al Smith used to say, 'Let's look at the record.'

"YOUR WAGES: It is our policy to pay higher wages than the average of the companies engaged in the same line of business as we are. This we are doing and will continue to do as long as it is possible.

"EMPLOYEE BENEFITS: All employees working for this Company are receiving the following benefits:

"Life insurance.

"Pension trust (covering employees with us at least five years).

"Sickness and accident benefits.

"Hospitalization and medical and surgical insurance for themselves, their wives and their children.

"Vacation with pay.

"Christmas bonus.

"Emergency loans (without interest).

"All of these are paid for entirely by the Company.

"Check up with your friends who are working for other companies which may or may not have a union and see whether they are getting all these benefits and in cases where they may be getting some of them do they have to pay for them in part or in whole.

"Talk with your fellow employees who have been with the Company for some time. Ask them whether they had to fight for wage increases, or whether it has been the practice of the Company to give these voluntarily. Ask them what happened in 1932 during the depression when, rather than lay many of them off, they were kept on, even though the work they did was not necessary. What has happened in the last few months when a paper machine was shut down, due to boiler or other changes? Were the men laid off, or did we keep them busy, although we could have saved money by laying them off? How about the 7% increase that we put into effect just before the wage freeze?

plaint is that the letter to the employees, interpreted in connection with remarks made by officers of the company and a foreman to a few of the men went further than appealing to their loyalty on account of past favors. It justified the inference that in the event the union was formed these voluntary benefits might be withdrawn and a less liberal labor policy followed.

We will first discuss the second ground of the Board's complaint. The letter, after listing the voluntary benefits, concludes as follows: "And now I'll close with this promise. In the past your Company has tried to play the game honestly, fairly, and always with the welfare of its employees in mind. Whatever the election on Friday decides, your Company will still continue to play the game, knowing that your interests and our interests are exactly the same." Though on its face this seems fair enough, nevertheless, it may be significant that this letter, which lists in such detail the petitioner's voluntary benefits to its employees, fails to state specifically that the benefits will not be withdrawn if a union is formed. The Board interprets this lack of a specific statement against a background of interviews in which representatives of the employer intimate that a loss of benefits may follow union organization. It concludes that the letter was intended to give and did give the impression that these benefits depended on the plant remaining non-union. We cannot say that this conclusion is not supported by substantial evidence. It is true that a trier of fact might conclude to the contrary because the evidence is far from conclusive but we are not triers of fact in this case.

On the basis of this finding the letter is clearly an unfair labor practice. It is one thing to appeal to the gratitude of the employees in order to convince them that a union is not necessary. It is a different thing to suggest that the benefits of a liberal labor policy would be lost if a union is organized. The latter means of persuasion is coercive in nature.[2]

The Board's order must be sustained in so far as it requires the petitioner to assure its employees that the benefits it is giving and the liberal labor policy it has adopted will not be changed because they vote for a union.

It may be added that there is little hardship on the petitioner in this order even if the Board were wrong on the merits. If in fact petitioner did not intend to give the impression that benefits might be lost through unionization it should be anxious to dispel that impression by an appropriate notice stating its real position on the question.

Nothing in the case of National Labor Relations Board v. Virginia Electric & Power Co.[3] is contrary to this ruling. In that case the court held that a letter and a speech to the employees, which extolled the company's labor policy and attempted to

---

Did we have to do this, or were we thinking of our employees and the fact that the wage freeze might stop any increase?

"Everything that we have ever done for our employees has been done without fuss or fanfare, but I do feel that this is the time to talk about these things. Ask yourself whether you honestly think that any one or any union could have done as well or better for you, or could have had your interests more at heart than we have.

"One more thing I would like to suggest. This is an important election. For many of you it may be the most important election you will ever vote in. It bears directly on your welfare and those dependent on you. The war has given us all many new problems—problems that make us nervous and jittery. Don't let your thinking become warped, because of these problems. Remember that your Company is not responsible for higher food prices, wage freeze, or rationing. Think clearly of those things your Company is responsible for and ask yourself if it has met them properly.

"And now I'll close with this promise. In the past your Company has tried to play the game honestly, fairly and always with the welfare of its employees in mind. Whatever the election on Friday decides, your Company will still continue to play the game, knowing that your interests and our interests are exactly the same."

Peter J. Schweitzer, Inc."

[2] Medo Photo Supply Corp. v. National Labor Relations Board, 64 S.Ct. 830. In this case the employer made a deal that wage increases would be granted if employees left a union. However, intimations to the same effect in the absence of an express understanding would seem to come within this principle.

[3] 1941, 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348.

show that the employees would gain no benefit from voting for a union, was a permissible expression of opinion. But the court was careful to point out that if such a letter, either by its terms or its background, could be construed as a threat or an intimation that economic pressure would be used it was an unlawful means of persuasion. That case was remanded to the Board because the background justified a further finding that retaliation was intended against individuals who promoted the union. In this case no retaliation against individuals is threatened. It is a case of economic loss to the entire group. We can see no distinction in principle between these two methods of unlawful persuasion.

█ The other ground of complaint by which the Board supports the order stands cn a less firm foundation. It is stated in the brief of counsel for the Board as follows:

"Furthermore, by extolling the Company's wage and personnel policies and by directing the newer employees to ask the other workers 'whether they had to fight for wage increases, or whether it has been the practice of the Company to give these voluntarily', Schweitzer brought home to the employees at large the point of his object lesson to Mulherin, namely that petitioner was prepared to grant the employees individually any concessions they could hope to secure through the Union.

"Moreveor, noting in the letter that 'this is the time to talk' about the benefits petitioner had unilaterally conferred upon the employees 'without fuss or fanfare', Schweitzer, as Gartner and Dixon had already done, stressed that petitioner had a strong claim 'to their full appreciation and gratitude'. And he made it unmistakably clear that he desired the employees to repay this claim by a negative vote in the election, a vote to continue, as he phrased it in testifying, 'under * * * the Company's sponsorship'. Finally, Schweitzer assured those who had already designated the Union that they were free to repudiate the Union in order to fulfill their asserted obligation of loyalty to petitioner by stating in the letter 'the fact that you signed some card distributed by the Union [does not] require * * * that you vote for the Union'."

To support this second charge the Board begins with so-called background findings which it says "reflect the history of or-ganizational activity at the respondent's plant prior to the time material herein". The findings read as follows:

"The Union made its first attempt to organize the respondent's plant late in 1941 or early in 1942. At that time, an organizer stationed himself outside the plant and distributed membership application cards to employees entering and leaving the plant. The following day the respondent posted on its bulletin board a notice, which announced a general wage increase of 5 cents an hour to its employees. Thereafter, organizational activity ceased. Although the record does not disclose what prompted the Union's withdrawal at that time, employee Carmen LaSalle, a credible witness, testified that, on subsequent occasions when employees were seeking a wage increase, 'rumblings' would be heard at the plant to the tenor of 'we will get a raise, let's start a little union talk'."

The Board then goes on to find similar methods of anti-union persuasion which it considers relevant to this case, as follows: The attempt to unionize the plant, out of which this controversy arose, began in January, 1943. The management learned of this activity in March, when a meeting was called. Within a day or two after the meeting the president and chief engineer decided to interview certain men in order to learn why they were dissatisfied and wanted a union. Only two men out of the 225 were called in by the management. One of them, Lombardi, had been distributing union cards during working hours in violation of the rules. According to Lombardi's testimony the president asked where he had obtained the cards, why he was distributing them, and why he wanted to join the union. The Board found, on conflicting testimony, that the president then added "we are treating you pretty good, I don't see why you would do a thing like that", and punctuated his remarks with a reference to the freezing of wages and the insurance benefits enjoyed by the employees free of charge. During the conversation Lombardi informed the president that his wife was in the hospital about to have a child. In accordance with the previous custom of the management Lombardi was given $50 for expenses. When it was learned later that a caesarean operation was necessary $50 more was given to defray the added cost. Lombardi testified directly that he never thought the president was trying to influence him in any way. The

Examiner found that the gifts to Lombardi were in accord with the custom of the management in other cases and further that "the interview carried with it no threats and falls into the classification of an appropriate inquiry made in contemplation of the announcement of an entirely proper administrative rule". He, therefore, disregarded it as an unfair labor practice. The Board reversed the Examiner on the theory that the ostensible purpose of calling Lombardi before the president was in violation of a rule against distributing union cards on company time. Since the president failed to restrain this activity in the future the Board concluded that the real purpose of the interview was to exercise an improper influence on Lombardi by treating him with liberality and forbearance during the election period.

Another employee, Mulherin, was called before the president and asked about his grievances. The purpose was admittedly to find out whether there were any particular grievances which had caused the desire for the union. Mulherin's requests were not unusual. They were all granted without any strings attached. He was active in union organization. There is other testimony of this character. The Board

attempts to use it in connection with the letter to show that the employer was trying to kill the union movement (1) by satisfying its employees so completely that they would not want a union, and (2) by calling its labor policy to their attention to induce them to vote against the union through loyalty and gratitude.

██ Certainly it cannot be claimed that an employer would be guilty of an unfair labor practice because he treated his employees well in order to forestall a union movement.[4] The question in this case is whether, having done so, he may remind them of that fact and claim credit for it during a period of a union election. It is true that this may be a strong argument against unionization. It would not affect a man who was convinced of the need of a strong union movement for the benefit of labor as a whole. It might convince one whose only concern was the immediate labor policy of his employer. But we believe that the Act gives the employees the right to choose between these considerations and that the National Labor Relations Board v. Virginia Electric & Power Co. case establishes the employer's right to comment on them.[5] We do not hold that this justifies an organized campaign or a

---

[4] We cannot agree with the concurring opinion filed here that an increase in wages or an improvement in working conditions made during an election period is an unfair labor practice provided there is no suggestion that these benefits would be withdrawn if a union is organized. Such a principle would mean that it is the duty of an employer to refrain from benefiting his employees in order to make them more inclined to vote for a union.

[5] In a similar case construing National Labor Relations Board v. Virginia Electric & Power Co., Judge Learned Hand said:

"In spite of a little ambiguity thrown upon the reasoning by the words last quoted, the conclusion seems inevitable that the court did not believe that the bulletin and the speech would alone support a finding of coercion. Possibly it so concluded because they could not have in fact coerced the employees; but we do not so understand it: the employer had raised his privilege and we read the decision as sustaining it. But it makes no difference which view we take: whether there was not enough evidence of coercion, or whether, though there was, the utterances were privileged: in either event, without more

they did not support the finding. The only question here is therefore whether the respondent's letter and speech were different enough to count. We shall not go over them in detail; they appear to us to be substantially the same in their general tenor and purport. The respondent professed itself willing to abide loyally by the results of the election, but did not conceal, though perhaps it made some effort to disguise, its preference for no union whatever. But there was no intimation of reprisal against those who thought otherwise; quite the opposite. The most that can be gathered from them was an argument, temperate in form, that a union would be against the employees' interests as well as the employer's, and that the continued prosperity of the company depended on going on as they had been. It seems to us extremely undesirable, particularly in so highly charged a subject matter, to draw fine-spun distinctions between two situations so closely alike; any we could make would be insubstantial refinements without real significance; would promote controversy and exacerbate, where the purpose should be to assuage. If there was a basis for finding that such a presentation of the employer's side might be a covert threat to recalcitrants,

protracted distribution of propaganda.[6] But such a situation is not before us here. Only a few employees were interviewed and the character of the persuasion was very mild indeed.

The decision of the court is that the findings and order of the National Labor Relations Board will be sustained in so far as they may be interpreted to require the employer in this case to make it clear that the benefits which it is now giving to the employees will not be affected or its liberal labor policy changed because of any future union organization of its plant.

Modified and, as modified, affirmed.

GRONER, C. J. (concurring).

The order of the Board in this case requires the employer to—

"Cease and desist from in any manner interfering with, restraining, or coercing its employees in the exercise of the right to * * * form, join, or assist labor organizations, * * *"

and requires that the employer mail to its employees notices stating it will not engage in the conduct condemned by the Board, and that it will post notices in its plant accordingly.

Judge ARNOLD thinks that a certain letter, which is quoted in full in his opinion and which was sent by the employer to the employees in advance of a plant election held by the Board, constituted an unfair labor practice. The ground of his holding is that the letter was intended to give and did give the impression to the employees that the continuation of the benefits shown by the letter to have been conferred by the employer upon the employees depended on the plant's remaining non-union. On this basis he holds that the Board's order should be sustained to the extent and only to the extent that it requires notice to be given to the employees that "the liberal labor policy it has adopted will not be changed because they vote for a union."

In my opinion the letter is not susceptible of this construction. I am unable to find in it a single word from beginning to end which contains an open or covert threat that the employee-benefits it enumerates will be withdrawn if a majority vote for a union. But in reaching his conclusion Judge ARNOLD says: "There is little hardship * * * in this order even if the Board were wrong on the merits. If in fact petitioner did not intend to give the impression that benefits might be lost through unionization it should be anxious to dispel that impression by an appropriate notice stating its real position on the question."

While, as indicated above, I am of the opinion that the letter is in all respects a fair and honest statement of the Company's long standing cooperative policy in its relationships with its employees, and of which—I may add—it has every reason to be proud, I have no objection to the requirement that it restate the fact that it contemplates no reprisals and will make none. I therefore concur in the requirement that such notice be given.

Judge ARNOLD, further holds that the employer by satisfying its employees so completely that they would not want a union, and by calling its labor policy to their attention so as to induce them to vote against the union through loyalty and gratitude, is not guilty of an unfair labor practice. This, in my opinion, is correct. I am

---

there was as much basis in the Virginia case. If on the other hand the employer's interest in free speech in the Virginia case was thought to outweigh an actual prejudice to the employees' right of collective bargaining, the employer's interest is the same in the case at bar and the employees' prejudice no greater. We can find no tenable distinction between the two." National Labor Relations Board v. American Tube Bending Co., 2 Cir., 1943, 134 F.2d 993, 995, 146 A.L.R. 1017, certiorari denied 320 U.S. 768, 64 S.Ct. 84.

[6] "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used, of which the relation between the speaker and the hearer is perhaps the most important part. What to an outsider will be no more than the vigorous presentation of a conviction, to an employee may be the manifestation of a determination which it is not safe to thwart." National Labor Relations Board v. Federbush Co., 2 Cir., 1941, 121 F.2d 954, 957. See National Labor Relations Board v. Trojan Powder Co., 3 Cir., 1943, 135 F.2d 337, certiorari denied 320 U.S. 768, 64 S.Ct. 76; National Labor Relations Board v. Sunbeam Electric Mfg. Co., 7 Cir., 1943, 133 F.2d 856; Valley Mould & Iron Corp. v. National Labor Relations Board, 7 Cir., 1940, 116 F.2d 760.

therefore also concurring in his holding that the order of the Board as to this feature of the case should be reversed.

EDGERTON, Associate Justice (dissenting in part).

The Board found that "even absent the letter, the [employer's] conduct was coercive and in violation of Section 8(1) of the Act." In other words the letter was not the only act by which the employer interfered with, restrained, or coerced its employees in the exercise of their right to self-organization. I think that the evidence supports this finding and that the Board's order should be enforced in full. Judge ARNOLD'S opinion recognizes only one type of interference, viz., a threat to discontinue certain benefits and to adopt a less liberal labor policy. In my opinion there were, in addition, at least three other types of interference.

(1) The Board found repeated instances of anti-union argument, by which the employer sought to persuade its employees that they would gain nothing by forming a union. It is true that such argument, if it does not amount to a protracted campaign and is not a part of a general "course of conduct * * * aimed at achieving objectives forbidden by the Act," is recognized by the Virginia Electric case as privileged.[1] But that case also recognizes that such argument is not privileged when it is a part of a general effort at interference and restraint.[2] It was part of such an effort in this case.

(2) The Board found that the employer questioned several employees with regard to their union activities. Such questioning, at least in its present context of expressed hostility to the union, is in my opinion a form of interference, restraint, and coercion.[3] Its evident purpose and tendency were to discourage the formation of the union by inspiring fear of reprisals.

(3) The Board found that the employer asked its employee Mulherin whether, if demands which he made in respect to wages and hours were satisfied, he would continue his union activities. Mulherin declined to commit himself. His wages, although they had recently been raised, were immediately raised again. The Board inferred, as it well might, that by this course of conduct petitioner attempted to influence Mulherin to abandon the union. In Medo Photo Supply Corporation v. National Labor Relations Board[4] the Supreme Court held that it was "an unfair labor practice for petitioner, in response to the offer of its employees, to induce them by the grant of wage increases, to leave the union." I take it that the unfairness in that case was in the employer's effort at inducement by economic means, not in the fact that the effort was successful or in the fact that the employer knew it would be successful. Accordingly nothing turns, in my opinion, on the presence in that case of an offer or agreement by the employees that they would leave the union in consideration of a wage increase. I think it was an unfair labor practice to grant any wage increase[5] during a unionizing

---

[1] National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 479, 62 S.Ct. 344, 86 L.Ed. 348. National Labor Relations Board v. American Tube Bending Co., 2 Cir., 134 F.2d 993, 146 A.L.R. 107.

[2] "If the total activities of an employer restrain or coerce his employees in their free choice, then those employees are entitled to the protection of the Act. And in determining whether a course of conduct amounts to restraint or coercion, pressure exerted vocally by the employer may no more be disregarded than pressure exerted in other ways." 314 U.S. 469, 477, 62 S.Ct. 344, 348, 86 L.Ed. 348.

[3] Cf., e.g., H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 518, 520, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Arcade-Sunshine Co., 73 App.D.C. 128, 118 F.2d 49, 50, certiorari denied 313 U.S. 567, 61 S.Ct. 942, 85 L.Ed. 1526; National Labor Relations Board v. Federbush Co., 2 Cir., 121 F.2d 954; National Labor Relations Board v. Stone, 7 Cir., 125 F.2d 752, 755, 756, certiorari denied 317 U.S. 649, 63 S.Ct. 44, 87 L. Ed. 522.

[4] 64 S.Ct. 830, 834.

[5] Cf. Southern Colorado Power Co. v. National Labor Relations Board, 10 Cir., 111 F.2d 539; M. H. Ritzwoller Co. v. National Labor Relations Board, 7 Cir., 114 F.2d 432.

The Board did not rely upon the general wage increase of 1941 and 1942, although that increase was granted during an attempt to organize the plant, because evidence regarding that increase "was introduced only for the purpose of background" and the complaint did not allege unfair labor practices prior to January, 1943.

campaign and as part of an effort to hinder that campaign. "Interference is no less interference because it is accomplished through allurements ráther than coercion, when, as here, the system is employed to stem a tide of organization * * *."[6]

[6] Western Cartridge Co. v. National Labor Relations Board, 7 Cir., 134 F.2d 240, 244, certiorari denied 320 U.S. 746, 64 S.Ct. 48.