### NATIONAL LABOR RELATIONS BOARD v. GUTMANN & CO.

No. 7585.

Circuit Court of Appeals, Seventh Circuit.

June 12, 1941.

Robert B. Watts, of Washington, D. C., I. S. Dorfman, of Chicago, Ill., and Howard Lichtenstein, of Washington, D. C., for petitioner.

Henry M. Tufo, Lewis F. Jacobson, David Silbert, and Robert B. Shapiro, all of Chicago, Ill., for intervener.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

Should the court give petitioner an enforcement order, Sec. 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c), against respondent, to carry out the Labor Board's order?

Respondent, an Illinois corporation, is, and since 1892 has been, engaged in the tanning business. It has two plants and employs (did in spring of 1937) about 350 employees, 32 of whom are foremen and subforemen.

Its business is so interstate in character as to bring it within the provisions of the Act. Jurisdiction of its labor controversy by the Labor Board is not disputed.

The history of this labor controversy goes back to the fall of 1934 when an unaffiliated union attempted to organize respondent's employees. Very shortly thereafter a so-called inside organization, known as the Workers' Co-operative and Benefit Association, came into existence. It became the active and recognized bargaining agent or union for the employees. Respondent paid its representatives for their time in Association activities and otherwise gave support to it. It was clearly outside the pale of the National Labor Re-

lations Act of 1935. The first organization disappeared permanently from the picture after the W. C. B. A. took the stage. In 1935 another organization (U. L. W., Local 79), affiliated with the A. F. of L., began a campaign to organize respondent's employees. In this campaign, or shortly thereafter, respondent discharged three of its employees who were active unionists and we infer, for their union activities.

In December, 1935, this local union filed charges with the Board against respondent, based upon the discharge of said three employees and based further upon the existence of the W. C. B. A. which was still active in the plant and which U. L. W. Local 79 claimed was formed and dominated by the respondent. A hearing was had by a trial examiner whose report sustained the charges and recommended the disestablishment of W. C. B. A. and the reinstatement of the three employees with back pay. No action was taken upon this report for nine months, or until the U. S. Supreme Court upheld the Act in the Jones & Laughlin Steel Co. case, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. Immediately thereafter, respondent posted notice in the plant stating that the W. C. B. A. would be dissolved and that the employees were entirely free to join any union organization or independent labor group. It entered into negotiations with the three discharged employees relative to their reinstatement and back pay. These negotiations culminated in an agreement which provided for their return to their employment and cash compensation while they were idle.

Within a few weeks, and on May 10, 1937, a campaign to form what was known as I. T. U., an allegedly "new inside union," was launched by five of respondent's employees. At the same time, another union, a sort of a successor to Local No. 79 (called in the record, the Union), began a drive among the employees for members. Petitioner asserts, and the respondent denies, that the employer took immediate and effective measures to induce its employees to join the I. T. U. and not to join the Union, which turned out to be an affiliate of C. I. O.

That dispute furnished the battleground, and the activity of respondent, the casus belli of the controversy which waged the next few years, between the Union and the Board on one side and respondent and its employees on the other. A study of the charges and the denials, the confessions and avoidances of the employer, engages our attention. The wishes of the employees, save as they have struggled to express themselves, have been lost in the heat of battle, the immediate objective of which was the selection of the bargaining agent, which was to speak for the employees, who are, it seems, dehors the combat, for reasons not quite clear.

Petitioner relies principally upon four acts of the employer, which, it asserts, persuasively point to interference, restraint, and coercion of employees, as well as domination and support of I. T. U., in violation of section 8(1) and (2) of the Act, 29 U.S.C.A. § 158(1, 2).

The first of the four acts complained of was the distribution of a pamphlet (or letter) to each of its employees. [1] Petition-

---

1  "(American Flag)
" 'And the Star Spangled Banner
Oh, long may it wave
O'er the land of the free
And the home of the brave.'
"GUTMANN AND COMPANY
(Incorporated)
Chicago

| New York | Manufacturers | Cable Address |
| Boston | of Leather | Gutleather Chicago |
| Philadelphia | | Codes Used |
| Cincinnati | Office and Tan- | Tanners Council |
| Columbus | nery | Western Union |
| San Francisco | 1503–1521 Web- | Lieber's |
| | ster Ave. | "May 13, 1937 |

"To All Employees of Gutmann and Company:

Labor Law

"There is much confusion in the minds of many workers as to their rights under the Federal Regulations Acts.

"1. The validity of the Federal Labor Relations Act has recently been sustained by the Supreme Court and we will, of course, comply with that Act and with any other Laws to which we are subject.

"2. The real purpose of the Labor Relations Acts is to *guarantee to every worker the free right to decide for himself, whether to join or not to join any labor organization,** just as you are free to join or not join any lodge or social club, such as the Eagles, the Elks, Knights of Columbus, etc.

"3. So far as this company is concerned, there will be no discrimination, for or against any employee because of membership or non-membership in any labor organization.

"None Required to Join Any Organization.

"4. *No one is required to join any organization to keep his job with this company,* and likewise this company will *not require any worker to refrain from*

*(Italics used to indicate portions of exhibit printed in bold-face type.)

er argues this document was prejudicial and improper. Respondent denies that it was objectionable, and says it was written in a spirit of complete sympathy and full cooperation with the spirit of the Labor Act.

The second act of respondent of which complaint is made was the recognition of the I. T. U. and the ignoring of a letter from the Union. The Union in its letter asserted it represented the majority of the workers and demanded the right to bargain for them.

A third act of respondent which evidenced a biased hand, so it is argued, was the payment of forty cents a month as check-off to the I. T. U.

The fourth charge was respondent's failure to reinstate the aforementioned three Union employees until after the drives by the Union and I. T. U. were completed. Prejudice, it seems, here lay in the fact that the advertisement value of said employees' return to work was withheld the Union and since anything hurtful to one union must be helpful to its competitor, the act established favoritism of said I. T. U.

A study of the evidence convinces us that the question is typical of many of these cases and may be stated thus—Is there sub-

joining any organization to keep his job with this company.

"5. In other words, there is nothing in any law which requires a 'closed shop' or a union agreement.

"The Supreme Court of the United States said:

" 'The (Federal) Act does not compel agreements between employers and employees. *It does not compel any agreement whatever.*'

Senator Wagner of New York, author of the Federal Act, said:

" '*It does not compel anyone to make a compact of* any kind if no terms are arrived at that are satisfactory to him. The very essence of collective bargaining is that either party shall be free to withdraw if its conditions are not met.'

"Collective Bargaining.

"6. We heartily approve of the principle of collective bargaining, and as you know, we have engaged in collective bargaining with you for the past three years or more. In line with our existing policy we are ready and willing at all times to meet with any group of employees or the representatives they may select for the purposes of collective bargaining, or adjusting any matters or grievances pertaining to them, all pursuant to the law.

"7. Hand in hand with the right of employees to organize into groups of their own choosing, goes the right of any group of employees to form any labor organization entirely their own, and this, of course, is in line with the principle of free choice as stated by President Roosevelt himself, when he said:

" 'The *Government makes it clear that it favors no particular union or particular form of employee organization or representation.* The Government's only duty is to secure *absolute and uninfluenced freedom of choice without coercion, restraint or intimidation from any source.*'

"We have built this company on the basis of cooperation and fair play. We will do all within our power to settle peaceably any differences of opinion or misunderstandings which may arise between any employees and the company.

"Individual Bargaining.

"8. An employee cannot be compelled to select any other employee, group or organization to bargain for him. Any employee is absolutely free to bargain for himself, and make his own individual arrangement concerning his employment on a basis mutually satisfactory to the management and himself.

"Our Record for 47 Years
"Steady Employment

"For over *47 years this Company has provided steady jobs* for workers, through depression, panics, wars and prosperity. Let us cooperate further to increase employment.

"Wages.

"For over 47 years we have been in the *front rank in raising wages* consistent with business conditions and competition in our industry. *For over 47 years we have paid wages every pay day without a shut down or stoppage.*

"*We believe that we are now paying as high wages as anyone in this community for our kind of work,* and we hope, with your cooperation, to continue to do so.

"Harmony and Confidence.

"For over 47 years workers, foremen and owners have *all pulled together as one harmonious family;* we have not found it necessary to resort to lockouts. *Workers have not found it necessary to strike to get a fair and square deal.* No worker or group of workers have ever been denied a fair hearing nor an amicable adjustment of all reasonable complaints.

"Will You Gamble on Unemployment and Strikes?

"According to statistics of the Department of Labor of the United States, there are still about 9,000,000 out of work.

"The record of the same department shows over 8,000 strikes in the past four years, and 5,000,000 men put out of work because of them. *The total loss of wages to workers has not been computed.*

"Agitators.

"*There is no record that any agitator can run a factory, get orders to fill, provide a single week's work, furnish a single steady job or a family a full dinner-pail—we have done this steadily for over 47 years.*

"Cooperation.

"Let us cooperate in improving employment, wages and mutually satisfactory relations and good will.

"Sincerely,

"Gutmann & Company (Incorporated)."

"Please note that nothing herein contained is intended to interfere, restrain or coerce any employee in the designation of any representative for collective bargaining or any self organization, or any other concerted activities for mutual aid or protection."

stantial evidence which supports the finding of the examiner?

■ The decisions which bind us leave no doubt about our duty to ignore flagrant abuses of judgment or of discretion, by the trier of facts, and to search the record for the sole purpose of ascertaining whether there exists some evidence which supports the Board's finding.

With this understanding, we approach our task.

The issue of unfair practices narrows itself to a question of favoring the I. T. U. by the employer.

Petitioner's attack is centered chiefly upon the above communication which the employer addressed to its employees on May 13, 1937.

■ Obviously, this letter must be read in its entirety. We can not, in fairness, pick out a sentence from its context and give it a true and correct meaning.

The only two paragraphs of which complaint is made, are headed "Harmony and Confidence" and "Agitators." Construed in its entirety we can find nothing in the letter which we can call a threat or an attempted coercion of the employees. If we ignore the rest of the letter and direct our attention to these two paragraphs, it would still require imagination to read into these three sentences, any veiled intimidation, any threat to the employees.

(2) Respondent received from the I. T. U., notice that it represented a majority of the employees, on June 5, 1937. I. T. U. advised the employer that its membership included 277 out of the 350 employees of the company. It supported this claim by submitting photostatic copies of signed membership cards of 275 employees.

The Board found, however, that the recognition of I. T. U. was evidence of partiality because later, on June 25, the representative of C. I. O. notified the employer that it claimed to represent the majority of the employees. We quote this letter:

"June 25, 1937
"Mr. Leo Elkan, Vice-President
Gutmann & Company Inc.
1511 Webster Ave.
Chicago, Illinois.
"Dear Sir:
"On this 25th day of June 1937, the undersigned come as a committee before Gutmann & Company Inc. and do claim that we have a great majority of the production and maintenance employes signed up as members of United Tannery Workers Union of America, affiliated with the Committee for Industrial Organization.

"In behalf and for the United Tannery Workers Union we demand sole collective bargaining rights for all of the production and maintenance employes of Gutmann & Company Inc. for the purpose of bargaining collectively for all of the production and maintenance employes regarding wages, working hours and other conditions of employment.

"We demand a written answer from Gutmann & Company Inc. on or before July 8th 1937 stating as to whether the company will obey the Laws of the United States of America as enacted by Congress and upheld by the Supreme Court as the National Labor Relations Act, Sec. 9(a) and (b), said answer to be addressed to: United Tannery Workers Union, Room 106 1550 W. Van Buren Street, Chicago, Illinois.

"In behalf of the Tannery Workers Organizing Committee:
"s/ John Tollick,
John Tollick,
President.
s/ Rudolph J. Burkey,
Rudolph J. Burkey,
Secretary."

The number of its members was not given; nor was there any offer of proof to show that the Union did represent the majority of the employees.

It is, we think, quite clear from the record that it did not represent a majority of the employees. Passing to one side the offensive intimations of the third paragraph of this letter and directing our attention to the record which supports or disproves the claims of the two competing unions, we must find for the I. T. U. The proof that 275 members out of 350 belonged to that organization necessitates this finding. It in no way conflicts with any finding by the examiner or the Board.

■ Respondent was confronted with the duty of recognizing a union which represented a majority of its employees. There could not have been two unions, each of which represented the majority of the employees. The claim of one must necessarily have been false—a bluff. There is no evidence to support the Union's claim of a majority. There was substantial proof, to-wit, photostatic copies, cards signed by 275 of the company's members, that I. T. U. represented a majority.

(3) The charge that the payment of 40 cents a month, "check-off" to the I. T. U., after its recognition, was a preference, must likewise be rejected. The payment of the check-off is not the real subject of complaint. The controversy is over which union was entitled to the payment of the so-called check-off.

 We hold it was to the union which represented a majority of the employees. The Union's position seems to be, if it represented the majority, the check-off should be paid to it: if some other union represents a majority, a check-off payment to it is unfair and is evidence of partiality.

The failure of the employer to put two employees back to work earlier is the last act of which complaint is made. The Board found that respondent's postponement of reinstatement of employees, Burkey and Tollick, from May 31, 1937 to July, 1937 was motivated by a purpose to deprive the C. I. O. of the aid of these organizers until the I. T. U. should have succeeded in winning a majority of its employees and thus hinder the C. I. O. campaign among the employees.

It appears from the record that these employees had been discharged; that the Board ordered their reinstatement; that after the Supreme Court decision upholding the National Labor Relations Act, they were reinstated and they were paid wages for the period between their discharge and the time they returned to work. They were not, however, returned to work until July 17, 1937. The record shows that these men were not prevented from taking as active part in the organization of the union as if they were at work. They were notified of a mass meeting and Burkey was active in breaking up one of the employees' meetings. At a later time, although not working, he was active at an employees' meeting. His principal work was to secure or endeavor to secure resignations of employees from the I. T. U.

The company's explanation of why they did not set Burkey to work was that someone else was working at the time in his place. This testimony is uncontradicted, save by the report of the examiner. On what he based his finding is not pointed out.

The I. T. U. had over 275 members on June 5. The Union was endeavoring from then on, to get cancellations of said members and one of the two discharged employees was engaged at this task. Just

how he could have been more effectual if he had been set to work, we can not see, unless it be on the theory that he would be more effective while allegedly working for the respondent although in fact he was working for the Union. It would seem to us that he was freer to *legitimately* work for the Union while not working for the respondent than he would have been were he working for and paid by the company, although in reality working for the Union on company pay.

It follows from what has been said that the finding of the Board is unsupported by substantial evidence.

The petition for enforcement must be, and is, hereby

Denied.