## NATIONAL LABOR RELATIONS BOARD
### v. J. L. BRANDEIS & SONS.
No. 12891.

Circuit Court of Appeals, Eighth Circuit.

Nov. 6, 1944.

Malcolm F. Halliday, Associate Gen. Counsel, of Washington, D. C. (Alvin J. Rockwell, Gen. Counsel, David Findling, and Mozart G. Ratner, all of Washington, D. C., on the brief), for petitioner.

Ralph E. Svoboda, of Omaha, Neb. (J. A. C. Kennedy, Yale C. Holland, George L. DeLacy, and Harry R. Henatsch, all of Omaha, Neb., Frederick S. Jack, of Tekamah, Neb., and Kennedy, Holland, DeLacy & Svoboda, of Omaha, Neb., on the brief), for respondent.

Before GARDNER, THOMAS, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order in which it found respondent J. L. Brandeis & Sons guilty of certain unfair labor practices, in that it had interfered with, restrained and coerced its employees in the exercise of their rights guaranteed to them by Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157. Respondent resists enforcement.

J. L. Brandeis & Sons, respondent herein, operates a department store in Omaha, Nebraska. On July 8, 1943, its employees voted on the question of designating a collective bargaining agent. The issue as submitted to vote of the employees was whether or not the Joint Council of Retail Clerks, International Protective Association, L.U.616, Building Service Employees, L.U.226, Sign, Scenic and Pictorial Painters, L.U.752, and Hotel Restaurant Employees L.U.644, all affiliated with the American Federation of Labor and designated in this record as the Joint Council, should be designated as the collective bargaining agent for the employees. The election resulted in a vote of 352 for and 359 against designating the four unions

as the bargaining agent. The election was held under the supervision of the Regional Director of the 17th Region and was certified by his agents to have been fair and secret.

After the election had been held the Joint Council filed objections alleging that respondent had engaged in unfair labor practices which affected the result of the election. In the meantime the Joint Council had filed charges of unfair labor practices and the Board issued an order consolidating the charges of unfair labor practices and those involved in the objections filed to the election. The Board found that respondent had engaged in unfair labor practices consisting of: (1) anti-union statements by buyer Florence La Boschin and assistant buyer Raymonda Anderson; (2) permitting the circulation within its store during working hours of an anti-union petition; (3) employing detectives to engage in surveillance of union representatives while in its store; (4) anti-union statements of its president, George Brandeis, and of its general merchandise manager, Karl Louis; (5) publishing anti-union articles in the May, June and August, 1943, issues of its house newspaper; (6) distributing anti-union bulletins and pamphlets from June 16, 1943, through July 3, 1943.

Prior to July, 1942, the history of respondent in labor matters was negative and uneventful, but in July of that year a campaign for the organization of unorganized employees of respondent was initiated. The solicitation for membership was at that time unproductive of results. The Joint Council published a paper, the "Unionist" and various special bulletins, which emphasized the advantages of collective bargaining through the unions. In January, 1943, representatives of the unions sought to have them recognized as collective bargaining agents. Respondent requested proof of majority representation and this the unions refused to produce. At that time the unions had about 90 signed cards authorizing representation, out of approximately 1,000 employees. From that time on the efforts of the unions to organize the employees increased in intensity and in hostility toward respondent. A slow-down strike in a heating plant of company affiliated with respondent was called in January, 1943, by an engineers' union, which resulted in shutting off the heat from respondent's store and twenty-

one other downtown buildings, and a sit-down strike of elevator operators in two downtown office buildings not affiliated with respondent was called. In February, 1943, the heat in respondent's store was again turned off and the operators of the elevators in the office building which also gave elevator service to respondent's store walked out. About 100 of respondent's employees walked out at that time. The unions reasserted that they represented a majority of the employees but declined to check authorization cards against pay-roll. They vigorously attacked respondent for denying them recognition. Some of the statements in the publications issued and circulated by the unions, referring to respondent and its officers, are as follows: "un-American attitude of the Brandeis Company"; "intolerable working conditions"; "Wages were shameful;" the Brandeis Company was "dodging or evading"; Mr. Pettis (secretary-treasurer of respondent) "slashed a contract" and it was "garbled up by Mr. Pettis to suit his selfish desires"; actions of the company referred to as "discrimination and exploitation tactics"; a statement by Mr. Brandeis, president of respondent, was denounced as "a sugar-coated piece of the same poison used by labor baiting employers"; that employees were "at the mercy of their employer and his arrogant straw bosses"; that the Brandeis Company was "union hating"; that promises of respondent "will not be kept"; the Brandeis management was referred to as "management's program of intimidation and stooge tactics"; that "Brandeis management and its agents have been and are now striving to poison your minds against the American Federation of Labor"; that respondent paid "a low starvation wage"; that respondent continued to "rob the employees of their lunch and rest periods"; that the Brandeis Company "has proven its inability to speak truthfully"; that "all the odorous, dirty actions of the Brandeis Company in their labor relations will be brought to the attention of the government"; that "352 loyal employees were not afraid of the J. L. Brandeis Company and its agents and the big black whip which they have held over the heads of their employees for so many years."

Respondent was in various of these publications openly challenged to answer the many charges made against it and it was stated that if there was no answer it was because respondent knew that the state-

ments were true. But respondent did make answer, and in March, 1943, it commenced the publication of the "Brandeis Service Men's News," as a means of communication between former employees in the armed forces and the civilian employees of respondent. In April, 1943, it was announced that the publication would be distributed generally among employees as a "house organ."

The intermediate report of the trial examiner set forth matters which he held to be coercive and to restrain and interfere with freedom of choice by the employees. In the April, 1943, issue of the "News" appeared the following:

"Recently some of you have been asked to sign what are termed 'authorization cards.' Some of you have told us that you signed these cards after having been advised that your signature was merely a matter of attendance at a meeting. It is probable that when you sign such a card you give the particular organization named in the card the right to 'act for you' or represent you for a year unless you withdraw the card in writing, which is sometimes difficult to do. *You should always read and make certain that you know what you are signing.*

"The store has never told any of you that you could not or should not join any organization or that it was necessary to belong to any organization to be employed here. This has been and always will be the store policy. * * *"

In the issue of the "News" for May, 1943, there was a reprint of an article by Westbrook Pegler, which had been published in an Omaha newspaper. It was prefaced by a statement that it concerned former members of a retail clerks' union in Chicago. The article stated that in Miami recently a federal court jury convicted Max Pollack, alias Max Caldwell, of conspiring to violate the draft act and thereby "removed from circulation a filthy underworld racketeer who had enjoyed a long spell of prosperity and terroristic power in the political slum of the party of humanity, the field of labor organization in Chicago. Caldwell, as he calls himself, had been a muscleman in a number of typical crooked Chicago unions of the American Federation of Labor and had persuaded Michael Savachka, his secretary-treasurer, to go into hiding in June, 1941, after a group of retail store employes summoned the nerve to revolt and demand an ac-

counting of their money. There is no way of ascertaining how much Caldwell stole because Savachka was supposed to have custody of the membership books and accounts and they have disappeared. The membership is believed to have been somewhere between eight and ten thousand clerks earning around $25 a week on the average and the initiation fee was $25 and the dues were $2 a month." The union was Local 1248 of the Retail Clerk's International Protective Association. The balance of the article is severe in criticism of Caldwell, and also of the American Federation of Labor for giving him countenance.

In the same issue of the "News" appeared a statement signed by George Brandeis, president of respondent, in which he said:

"The management of our store recognizes the right of every employee to join any union or any other organization. Such membership will not affect any employee's position with the store.

\* \* \* \* \*

"During the past three years, however, efforts have been made to have you join various unions. Once each week in the past six or eight months, leaflets have been distributed to employees as they left the store. These have contained many statements which you who work here know to be untrue. We have made no effort to answer these, but believe you are now entitled to the facts.

\* \* \* \* \*

"The management of our store appreciates the difficult conditions in existence today. We realize that some items in the cost of living have increased, and we are doing our best to increase wages wherever possible. * * * In the past we have had some success with the Federal Wage Approval Agencies, both in the matter of bonuses and in the matter of increased weekly pay. While our efforts along this line will continue we can not make promises because such decisions are in the hands of the government. I have no hesitancy in saying I believe that no one can represent you better in these efforts than we can.

"The question of whether or not you wish to be represented by a union involves several other questions, all vital to your future welfare. You should weigh these questions carefully, logically and unemotionally.

"1. To what kind of leadership are you going to entrust your future with the store: Is it unselfish or not? Is it interested in your personal, individual welfare, or is it self-seeking?

"2. On the basis of its past record is it open and above board and dependable, or don't you know?

"You should think these questions over, talk them over at home, and then reach your decision. Possibly you also should, ask yourself why it is that total strangers suddenly have become so interested in your welfare. What have they done for you, what can they do for you that you can't do for yourself? Should you wish any additional information on any of these questions, please feel free to discuss them with any official of our store. We will be glad to discuss these or any other individual problems with you."

The following also appeared in the May issue:

"Who pays the salaries and expenses of those zealous, hard-working gentlemen, the union organizers, who have been in Omaha for months campaigning unceasingly for the proposal to make the A. F. of L. the bargaining agents in our store?

"Who is paying the costs of those circulars they are distributing, each week, setting forth over and over again their appeals to our employees to accept their proposal?

"There is an old saying that we 'shouldn't look a gift horse in the mouth.'

"The idea probably is that if we receive a gift from somebody, we accept it just as it is, because after all, it didn't cost us anything.

"But here's a so-called 'gift' which it might be well to examine rather carefully.

"The unions are trying to 'give' to all the Brandeis employees the privilege of having the Union represent them in all their dealings with the store. They make lots of promises about what the 'gift' will do for us.

"It is just possible that the 'giver' in this case will profit more by the 'gift' than we will.

"The union organizers almost never refer to the fact that their little gift will cost us all an initiation fee of $2.00 and $1.50 a month dues. But, if we look into the meaning of this $1.50 a month it isn't so difficult to understand why the union is go-

ing to so much trouble to make its great 'gift' to us.

"There are approximately a thousand of us 'eligible' to union membership according to the organizers. That means $1,500 a month. And $1,500 a month means $18,-000 a year.

"And this $18,000 a year is only the smaller part of what the union organizers expect to receive from the 'favors' they want to do for us.

"If employees of our store become unionized, it will be only a short time, no doubt, until all employees of retail stores in Omaha will be unionized. The total is around 3,500. The little $1.50 a month from 3,500 people adds up to the tidy sum of $5,250 a month. And that much money per month means $63,000 a year.

"Of course, there will be some expense in collecting dues, sending out bills, keeping a few people on the union payroll and other expenses; but the net from the $63,-000 per year should be very substantial.

"When we examine the 'favors' which the union wants to do for us and look into the financial side of it from the union's point of view, we really shouldn't be surprised and annoyed that the union boys and girls work so hard to get us in. Who wouldn't work hard and diligently for $63,-000 a year?

"Of course, any employee of this store has a perfect right to join any union. Our employees have always had that right. But like every other question we ever heard of, this one also has two sides."

In the June issue of the "News" is an article entitled "Tired of Strikes," which is a quotation from an address by Frederick C. Crawford, president of the National Manufacturers Association, stating the man hours of production lost due to strikes during February, March and April, and the number of bombers which could be produced in that number of man hours. The conclusion of the address is as follows: "The public is sick and tired of the endless shilly-shallying with the labor problem by irresponsible bureaucrats on the one hand and irresponsible labor leaders on the other. The public is disgusted with daily screaming headlines of strikes, work holidays, disorders and defiance of government by short-sighted and wilful labor bosses."

In the same issue there is an article entitled, "Men at the Front are Not Quib-

bling," which contains the following: "Our boys at the battlefronts are giving their best. They are not quibbling, quarreling or complaining about hours of work, the rate of pay, nor the inconveniences and hardships demanded of them. They do not lay down their arms because these things displease them. Their only complaint is about the home front, and·they are bitterly criticizing those at home for delaying the Victory and the return of Peace by following the lead of labor racketeers who place cause of their unions and their own personal gains ahead of Country and Victory in the war."

The "News" of August carried reprints of letters from former employees of respondent who were in the military service. In one letter the writer said: "Enjoy your servicemen's paper very much; but it makes me plenty sore to read how these labor agitators are trying to undermine the peace of mind of your employees. Things were different a few years back during the depression years, when the store carried the burden of paying a lot of us when they could have gotten along with less help. I know the old gang is well satisfied with the square treatment the store has always given them and I hope they get those agitators kicked out once and for all."

Another letter thanked respondent and President Brandeis for the $25 Christmas bonus which he had received from the respondent and stated, "It's too damned bad we can't have more men like him (Brandeis) and less men like John L. Lewis and his asininity."

From time to time respondent issued circulars which contained comment on the approaching election. A June 16 circular contained the following:

"If a majority of those voting, should vote in favor of the union, and the Board's order should thereafter be sustained, it means that in the future if any of you have any matters to take up with the store regarding wages or working conditions or anything else that affects employment in any way, you will be expected to take them up through a business agent or other representative of one of the various unions.

"If a majority of those voting should not favor joining the union, the situation will continue as it has in the past, whereby any employee or any group of employees has the right at any time to discuss any subject with the management."

A July 2 circular contained the statement that in the forthcoming election the employees were not voting for or against a contract, but were voting only to decide whether or not they would "continue to deal directly with the management" or "turn this wholly over to the unions." It stated that all wage increases were completely controlled by the government, and cited cases in which the War Labor Board and the Economic Stabilization Director had refused to approve wage increases. It was pointed out that the Joint Council had submitted a proposed contract to the respondent containing a provision for a closed shop and, in the alternative, for recognition of the Joint Council as the representative of all respondent's employees. These two provisions were said to be especially important; that if the request for a closed shop were granted, it would mean that the employees must belong to a union and must pay their dues, and if they quit the union or failed to pay their dues, they could no longer be employed by the respondent. It was observed that if the request for a closed shop were not granted, but the Joint Council was recognized as the representative of all employees, "any contract signed by the union would apply to all employees, whether union members or not."

On July 3, respondent issued a small pamphlet entitled "Questions and Answers by Karl Louis." Karl Louis was the merchandise manager of respondent and respondent's second highest ranking official. The intermediate report of the trial examiner thus describes this pamphlet:

"The pamphlet described itself as an effort to combine, and answer questions which had been asked of the respondent concerning the forthcoming Board election. The pamphlet stated that it was not intended to be either anti-union or pro-union. It repeated the respondent's assertion that the employees had the right to join or not to join any organization of their own choosing. It informed the employees that in the event they did not clearly understand any part of the pamphlet, or if they had any other questions which had not been answered to their satisfaction, they could go to Louis or any of the other executives of the respondent, who would do everything possible 'to be helpful.' Among other things, the pamphlet reviewed the activity of certain sympathizing unions in depriving the store of heat, and the refusal of

the Joint Council to submit its application cards to some impartial persons for a payroll check for the purpose of proving its claim to represent a majority of the employees. It stated that if the Joint Council were successful in the election, the employees might have to join a union or continue to be a member of a union whether or not they so desired. One of the questions contained in the pamphlet was 'Several statements made have been called untrue. Please go over them and tell the facts about each.' In answer to this question, Louis wrote in part, 'Gladly. Many statements have been made by irresponsible leaders, and they should be corrected before you vote.' He then discussed some of the union's statements concerning hours of work, wage rates, seniority policy, and concluded, 'When statements like these, which you know are untrue, are made to you by irresponsible leaders, how can you believe any of their promises?' Another question contained in the pamphlet asked, 'Shall I vote to have the union represent me?' In reply, Louis said that he could not answer that question yes or no, but that perhaps he should put that question to the employees in another way, namely, 'Do you want to be represented in your dealings with the store, by the people who, in trying to organize you, resorted to the kind of statements that you have heard and read for many months, and which, as illustrated above, are *plainly untrue?* Do you think that their efforts to organize you are for your interests, or for theirs?' The pamphlet closed with another urging of the employees to vote in the election, and with the announcement that if there were any information of any kind desired by the employees, they should not 'hesitate to ask for it.' "

In addition, there were oral statements by Karl Louis. On February 19 and February 22, the employees were kept a few minutes after store closing hours, at which time Louis explained to the employees why the heat had been turned off at the store those two days. He reviewed efforts of respondent to get wage increases and bonus payments approved by the appropriate governmental authorities. He said: "I am not going to make any silly and fantastic promises of 30%, 40% or 50% or greater wage increase that some people are making to you, when they know damn well (excuse my French) that the Government of the United States and the Wage Boards are

controlling this—not they, not you, not we, —and that nobody can get a cent beyond what the Wage Board and the regulations permit. Is that clear? I could stand here until Doomsday and make you all kinds of silly promises. I will be damned if I will. We are going to do all we are permitted to do. And we are not going to lie about it."

A meeting of employees was held July 2 at 8 o'clock a. m. After remarks concerning a bond drive, Louis took up another subject. Things, he said, had been said to mislead people, to paint a picture utterly different from what it is, and to lead people into paths that may be disastrous for them; that in those circumstances, his friendship for the employees compelled him to make the remarks he was going to make. He said he was not going to say anything against unions because he knew no arguments against them; that respondent had dealt with unions for a great many years; that respondent had no trouble with those unions; that as far as his own experience with the members and leaders of those unions was concerned, he had found them to be honorable men. He said he was "going to attack the things that the union organizers said and did—things they said and did in order to induce some of you to join the movement." In the course of his remarks he said: "Hitler wrote a book 'Mein Kaumpf'. Some of you may have read it. In it he states that if you want to get people to follow you, tell them lies, but tell them big enough. And he said if you tell these lies long enough and over and over again, finally everybody will believe you. Well, for a time that did work in Germany. Now I don't mean to say to you that the union organizers who spread certain stories had read 'Mein Kaumpf' or that they were trying to imitate Hitler. But the method compares favorable."

He then reviewed the Joint Council's campaign, including the action of the A. F. of L. affiliates other than the Joint Council, in turning off heat and the elevator strikes. He referred to the claim of the Joint Council that it represented a majority of the employees of respondent and its refusal to submit its membership cards to a group of three impartial outsiders for a check against respondent's pay-roll; its insistence upon determining its claim to representation by a secret ballot election. He said that the claim of the Joint Council of representation was backed by the signature of 63 of approximately 1,100 employees on

union cards. He argued that to grant the Joint Council's demands would require respondent "to force close to 1,100 people to do the bidding of a few organizers who had pulled and pushed and coerced and induced 63 people to accept the idea that they should be represented by these men, and they in turn should force the rest to do their bidding." "Is that democratic? Is that American?" he inquired. He denied the campaign statements of the Joint Council concerning respondent's wage rates and working conditions; he denied the assertion that hundreds of employees were required to work 54 hours a week, that a majority of respondent's employees earned only $12 a week, and that respondent discharged its employees when age impaired their usefulness. He pointed out a great many other things the Joint Council had said which he said were not true, and then asked, "What sort of trust can you have in the rest of their promises and statements, if in your own contacts with people they have told you things over and over again which you know are not true. Will you believe them in others?" He called the promise of the Joint Council for increased wages "unadulterated bunk" which had been repeated over and over again to mislead people; he pointed out that wage increases were subject to the approval of governmental agencies. He denied the claim of the Joint Council that it was responsible for the wage increase and bonus payments which respondent had granted after the commencement of Joint Council activity. He then proceeded to consider methods the organizers had used. He said the Joint Council had called respondent "un-American because it would not push 1,040 people, or 1,030, whatever the number was, into doing the bidding of some organizers and 63 other people"; that those who had not joined the Joint Council had been called stooges, traitors and rats. He said, "There are some of you who honestly think these men are honest and they believe in them. I believe you are mistaken but I don't think you are stooges or traitors or rats. I think you are ladies and gentlemen, and I think you have a right to your opinions, and I think you are Americans, even though you follow certain men whom I disapprove personally. But you have that right of opinion." He stated again that he was not talking against unions or unionism, but about "the character of the leaders who are asking you to sign up with them and

follow them and entrust your fate and your future to them—who have purposes of their own which in a monetary way are not unimportant—and want you to sign a piece of paper with a cross on the 'yes,' thereby indicating from now on they have the authority to handle your affairs. Now you might easily ask me, as I have been asked, 'What have I to consider?' I am not going to talk about that. But you might lose your right to work. You might be called out on strike to enforce the will of leaders who have no interest in your affairs, who try to get you to follow them by signing with them by stating to you that most of you work 54 hours, that we discharge employees when they reach a certain age, that we intend to fire people when the war is over. They must have looked at the record of the last war—the depression. Do you think that you can believe people like that in other things, when they say one after another of the statements I have just told you? Do you?"

Employees were reminded of the Board election, and urged to vote regardless of whether they voted for the Joint Council or for their "personal right and freedom."

The trial examiner found that "respondent's conduct during the pre-election period, as evidenced by the facts above set forth, was designed to, and had the necessary effect of interfering with, restraining and coercing the employees' choice of a bargaining representative."

Other unfair labor practices were found to have been practiced by respondent, in permitting circulation within the store during working hours of anti-union statements by supervisory employees, by the making of hostile remarks by supervisory employees, and surveillance of union representatives while in the store.

The Board approved the findings of the trial examiner, and entered the cease and desist order which it asks to have enforced.

 It is the contention of the petitioner that notwithstanding the constitutional guaranty of the right of free speech preserved by the First Amendment to the Constitution, respondent as an employer "had the affirmative duty of maintaining a complete and unquestioned neutrality." While the teaching of some of the earlier decisions appears to sustain the contention that an employer must be neutral in his attitude in all labor matters and must refrain from expressing his opinion, we

think the case of National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348, marks a definite departure from that view, and the trend of judicial decision since the Virginia Power Company case supports the view that an employer may disseminate facts within the area of dispute, may even express his opinion on the merits of the controversy even though it involves labor organizations, may indicate a preference for individual dealings with employees, may state his policy with reference to labor matters, and may express hostility to a union or its representatives. National Labor Relations Board v. Virginia Power Co., supra; National Labor Relations Board v. Brown-Brockmeyer Co., 6 Cir., 143 F.2d 537; Continental Box Co. v. National Labor Relations Board, 5 Cir., 113 F.2d 93; Montgomery Ward & Co. v. National Labor Relations Board, 7 Cir., 107 F.2d 555; Midland Steel Products Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 800; Press Co. v. National Labor Relations Board, 73 App.D.C. 103, 118 F.2d 937; National Labor Relations Board v. Ford Motor Co., 6 Cir., 114 F.2d 905; Edward G. Budd Mfg. Co. v. National Labor Relations Board, 3 Cir., 142 F.2d 922; Jacksonville Paper Co. v. National Labor Relations Board, 5 Cir., 137 F.2d 148; National Labor Relations Board v. Gutmann & Co., 7 Cir., 121 F.2d 756; National Labor Relations Board v. American Tube Bending Co., 2 Cir., 134 F.2d 993, 146 A.L.R. 1017. The right of free speech guaranteed by the constitutional amendment extends to labor matters and the dissemination of facts. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093. It is only the use of the right of free speech in labor matters under such circumstances and conditions as to coerce the will of employees that is forbidden. National Labor Relations Board v. Brown-Brockmeyer Co., supra; Texas & N. O. R. Co. v. Brotherhood of Railway & Steamship Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034.

■ If respondent used coercive language it may be held responsible in these proceedings notwithstanding the constitutional guaranty of the right of free speech. We have fully set forth the remarks of the officers of respondent because a consideration of the language used must determine its character. This is a question of law. The sole statutory test is interference, restraint or coercion. Secs. 7 and 8, National Labor Relations Act, 29 U.S.C.A. §§ 157, 158; Wilson & Co. v. National Labor Relations Board, 8 Cir., 123 F.2d 411; National Labor Relations Board v. Star Publishing Co., 9 Cir., 97 F.2d 465; National Labor Relations Board v. Glueck Brewing Co., 8 Cir., 144 F.2d 847; National Labor Relations Board v. Hudson Motor Car Co., 6 Cir., 128 F.2d 528. As said in the Virginia Power Company case, supra [314 U.S. 469, 62 S.Ct. 349, 86 L.Ed. 348], the employer here "set forth the right of the employees to do as they please without fear of retaliation." This is made very clear in the printed statement of the president of respondent as it was printed in the "News," where it is said "The management of our store recognizes the right of every employee to join any union or any other organization. Such membership will not affect any employee's position with the store." In no utterance, whether it was printed or oral, does there appear any threat of reprisal for any action which the employees might take in the matter of union organization or activities. In fact, the trial examiner in his report says, "It is true that the respondent frequently stated that its employees were free to join any labor organization they desired and that they were free to vote for or against the Joint Council as their own good judgment dictated."

A record somewhat similar was considered by the Circuit Court of Appeals of the Second Circuit in National Labor Relations Board v. American Tube Bending Company, supra, the opinion in which was written by Judge Learned Hand. In that case the president of the employer read a speech to the assembled employees on the eve of election. There was also a letter directed to the same question. In speaking of these the court said [134 F.2d 995, 146 A.L.R. 1017]: "We shall not go over them in detail; they appear to us to be substantially the same in their general tenor and purport. The respondent professed itself willing to abide loyally by the results of the election, but did not conceal, though perhaps it made some effort to disguise, its preference for no union whatever. But there was no intimation of reprisal against those who thought otherwise; quite the opposite. The most that can be gathered from them was an argument, temperate in form, that a union would be against the employees' interests as well as the employer's, and that the continued prosperity of the company depended on going on as they had been."

In National Labor Relations Board v. Brown-Brockmeyer Co., supra, utterances on behalf of the employer were urged as coercive and constituting unfair labor practices. In the course of the opinion it is said [143 F.2d 541]: "Nor was it an unfair labor practice for the respondent to state in its letter of September 15, 1942, that the C. I. O. was responsible for the rescission of the permit for women to work overtime. The respondent's letter dealt with the facts of the controversy, and therefore fell 'within that area of free discussion that is guaranteed by the Constitution.' Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093."

Again the court said: "The right of free speech does not depend upon the accuracy of the ideas expressed. If respondent honestly ascribed the loss of privilege to the protest of the Union, it was entitled to express that belief, and no testimony in this record sustains the finding that respondent's statement in the letter of September 15th was not honestly made."

Again it is said: "While Steffen Brown, Sr., respondent's president, Steffen Brown, Jr., respondent's vice president, and some of respondent's employees made certain derogatory remarks against the Union, growing mainly out of the difficulty as to working holidays and overtime, they were made without threat or coercion. *No threat or intimation of a threat to any union member or to any workman contemplating union membership is presented.* (Italics supplied). In fact only one employee, Edith Rowland was shown to be laid off during this period, and her discharge was found by the Board to be not unlawful. An employer has the right of freedom of speech and may express his hostility to a union and his views on labor problems or policy, providing he does not threaten or coerce his employees."

In the instant case no employees were discharged for union activities or union membership.

In Continental Box Co. v. National Labor Relations Board, supra, it is, among other things, said [113 F.2d 96]: "We do not agree with the Board that the statement of policy the company sent out just before the election, in any manner violates the letter or spirit of the Act or, standing alone, is any evidence that the employer was undertaking to interfere with or dominate its employees or any association they would form. The constitutional right of free speech (Const. amend. 1) in regard to labor matters is just as clearly a right of employers as of employees, and if the act purported to take away this right, it could not stand. (Citing authorities.) But the enforced statute has not undertaken at all to interfere with or limit the right of free speech. All that the statute prohibits is domination, interference and support. The employer has the right to have and to express a preference for one union over another so long as that expression is the mere expression of opinion in the exercise of free speech and is not the use of economic power to coerce, compel or buy the support of the employees for or against a particular labor organization."

In Edward G. Budd Mfg. Co. v. National Labor Relations Board, supra, it was sought to have the president of Edward G. Budd Mfg. Co. adjudged guilty of contempt. A decree had been entered directing the company to cease and desist from certain unfair labor practices. The company complied with the requirements of the decree but the president in doing so mailed a letter to each of its employees. This letter recites that it was compelled to withdraw its recognition of the union as a bargaining agent and proceeded to say that this "places upon you and your fellow workers the responsibility of the future." The letter continued that the employees might decide to have no union at all in the plant, might decide to affiliate with an outside organization, might decide to form an independent union of their own, and continued with the statement that, "In any event, yours is the freedom of choice. You should, however, not act without a complete knowledge of the facts concerned, and I am therefore setting forth in the attached pages a detailed statement for your consideration." The letter concluded by urging the employees to "read these pages carefully, and give them your mature deliberation before arriving at a decision." In holding the officer not guilty of contempt the court, among other things, said [142 F.2d 926]:

"We fail to see how the letter and enclosure standing alone can be thought to violate anything contained in the decree. Certainly, there is no direct prohibition in the decree purporting to restrain the employer or its officers or agents from entertaining opinions on labor matters or on any other subject or from giving such opinions free expression. Nor could the decree validly contain any such prohibi-

tion. 'In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution.' See Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093.

"It can hardly be questioned that the constitutional guaranty protects the employer and the employee alike. Thus, to make known the facts of a labor dispute has been recognized as a constitutionally protected right of a member of a union."

▉ It is here urged by the Board that the repetition and vehemence of statement by the officers of respondent rendered such statements coercive but we think the right of free speech and the exercise of that right can not rest upon so fragile support. So long as the reasoning power of the employee and not his fear is appealed to, the Constitution protects. Certainly, effectiveness of statement is not a test of its constitutionality; neither is accuracy of the views expressed. National Labor Relations Board v. Brown-Brockmeyer Co., supra. One may descend to vilification, false statement or exaggeration and still be protected in his right of free speech. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352. As said by the Supreme Court in Thornhill v. Alabama, supra [310 U.S. 88, 60 S.Ct. 741, 84 L.Ed. 1093]: "The safeguarding of these rights to the ends that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion is essential to free government."

▉ 'We conclude on this phase of the case that neither the written nor spoken words of respondent's representatives constituted unfair labor practices within the meaning of the Labor Act.

The Board further found that respondent had engaged in an unfair labor practice in "employing detectives to engage in surveillance of union representatives while in its store." For many years prior to the time here in question respondent had employed the services of Danbaum, Inc., an agency which supplied plain clothes operatives to Omaha stores to protect them against shoplifters, poor credit risks, and for similar purposes. In the spring of 1943, respondent complained to the Joint Council that its representatives were entering its store too frequently and were interfering with the employees in the discharge of their duties and it requested the Joint Council to cease the practice. The reply was to the effect that its representatives, like other members of the public, had a right to be in the store and refused to do anything about it. Upon this refusal, and not until then, respondent requested Danbaum, Inc., to furnish it with two additional operatives to prevent the representatives of the Joint Council from molesting the employees or interfering with them during working hours. Accordingly, the agency furnished Alfred Nelson and Jasper Kirk, who were assigned to the task of trailing representatives of the Joint Council when they entered respondent's store.

The Board in its decision recognized that the privilege of entering into a retail store by organizers is subject to abuse because one "who while entering a store for the purpose of making a purchase, may engage in solicitation during store hours, which will interfere with the efficient operation of the store. We do not condone such abuse." It found, however, that no abuse occurred which justified the action of respondent and that there was no rule prohibiting employees from engaging in conversation with outsiders while not engaged in sales transactions, and that it did not appear that buyers and department heads were unable to prevent abuses should they occur. Although the operatives made no report of their activities to respondent, the Board concluded that the mere trailing would constitute an unlawful surveillance, and that the act of the operatives in standing near constituted a restraint.

▉ There is evidence which is not disputed, that the practice of organizers in coming into the store during business hours to make organizational contacts with employees was disturbing to the employees. As before noted, a protest against the practice made by the management to the head organizer was met with a refusal to refrain from the obnoxious practice. The conclusion that a step taken to curtail this abuse was an act of restraint and coercion on the part of respondent can not be sustained. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established, * * * and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is

one of fact for the jury." National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 505, 83 L.Ed. 660. Respondent might legally have forbidden solicitation of membership in labor organizations on its premises during working hours. LeTourneau Co. of Georgia v. National Labor Relations Board, 5 Cir., 143 F.2d 67. Its action according to every legitimate inference that may be drawn from the evidence was taken to protect it in the discharge of its duty to customers and its right as an employer. Any other conclusion rests upon suspicion alone. Respondent could have prohibited proselyting on its premises during business hours. That it did less, certainly can not subject it to just criticism.

■ The Board contends that respondent is responsible for remarks of certain of its minor supervisory officers which are claimed to indicate hostility on the part of respondent toward the union. In considering these remarks it must be borne in mind that respondent had consistently proclaimed, both by spoken and written words, its fixed policy that employees were free to join or not to join a union and to vote accordingly without fear of reprisals from respondent. There were some 117 so-called supervisory employees. A witness testified that shortly before the election Raymonda Anderson, assistant head of the main floor department, stated to her that she had just returned from a meeting and had promised Pettis that she would see that the employees in her department voted against the Joint Council in the election. Another witness employee testified that on July 7, 1943, she overheard Florence LaBoschin, the buyer of the sportswear department, and another employee discussing the election, and that during the course of the discussion LaBoschin told the employee, "You be loyal to the store and the store will be loyal to you." Another witness testified that on July 7, 1943, the day before the election, LaBoschin came to the millinery department and asked why the witness "had that God damn pin on (referring to a union pin)" and said that if she would take the pin off and throw it away she would take her to Mr. Dixon, the superintendent, and get her a good job for life. LaBoschin, speaking of the Joint Council and the forthcoming election, stated that none of the employees in her department "was for the movement, that they knew better"; she called the Joint Council a "little bunch" who

were attempting to organize the store in order to "make some money." The statements are denied but that simply presents a question of the credibility of the witnesses, and we accept the finding that the statements were made. The question of law is presented whether respondent should be bound by the chance remarks of subordinates in view of its pronounced policy. It has no history of labor troubles nor union hostility. Its expressed attitude, reiterated many times, advised the employees in unmistakable terms that they might, without fear of reprisals, exercise absolute freedom of choice in their actions and opinions on labor matters. There were, as has been observed, 117 supervisory employees. Assistant department heads had been recognized as eligible to union membership and qualified to vote at the forthcoming election. When, as here, an employer has clearly defined his attitude of noninterference, the expressions of minor supervisory employees to the contrary must be regarded as their individual views—they speak without authority from their employer. National Labor Relations Board v. Clinton Woolen Mfg. Co., 6 Cir., 141 F.2d 753; Utah Copper Co. v. National Labor Relations Board, 10 Cir., 139 F.2d 788.

■ Shortly before the election, a "round robin" or anti-union petition was circulated in the store during working hours. It was signed "Employees Committee." It recited that both sides had presented their views and that the employees were about to cast their ballots to determine whether or not the Joint Council should be the collective bargaining representative of the employees. It stated that many of their co-workers were away in the armed services; that it was up to them to preserve and keep intact the home front, and concluded with the words,

"With good sound reasoning and your own better judgment may your conscience guide you in making your very, very important decision, to enable us to carry on in the future as we have done in the past and be our own representatives."

This was signed by 204 employees including several assistant buyers and department heads.

The trial examiner held that, "There is no evidence that the respondent was directly responsible for the drafting and circulating of this document." He expressed

the view, however, that it was consistent with the views of the officers of respondent and was circulated in the store during working hours.

The Board found that respondent should be bound by the acts of the assistant department heads, but if not, it was reasonable to infer that it knew of the petition and its circulation. The subject matter of the petition is not so remarkable in content or phraseology as to mark it as proceeding from the management. The expressed desire to have things remain as they were can not, in the circumstances here disclosed, be construed as coercive. To so conclude is inconsistent with the pronounced and established policy of respondent, and hence the acts of its subordinates can not bind it. National Labor Relations Board v. Fairmont Creamery Co., 10 Cir., 143 F.2d 668. All the signers of the instrument had been held to have been eligible to vote at the election.

The order of the Board setting aside the election is not reviewable. It was not set aside because of the alleged ineligibility of any of the challenged voters. We therefore pretermit any discussion of that phase of the Board's order.

The petition for enforcement of the order to cease and desist is therefore denied.