## NATIONAL LABOR RELATIONS BOARD v. WINTER et al.

### No. 3193.

Circuit Court of Appeals, Tenth Circuit.
April 13, 1946.

720

Robert Fousek, of Kansas City, Mo. (David A. Morse, Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Joseph B. Robison and Barnard Morrison, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

W. W. Grant, of Denver, Colo. (Nathan Kobey, of Denver, Colo., on the brief), for respondents.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board.[1] Winter, Weiss, Maurice B. Shwayder, Frances Shwayder Borwick, and W. W. Grant[2] are copartners doing business under the name of Winter-Weiss Company.

Upon an amended charge filed by International Union, United Automobile, Aircraft and Agricultural Implement Workers of America,[3] an affiliate of the Congress of Industrial Organizations, the Board issued its complaint against the respondents, alleging that they had engaged in unfair labor practices within the meaning of § 8 (1) and (3) and § 2(6) and (7) of the National Labor Relations Act,[4] 29 U.S.C.A. §§ 158(1, 3), 152(6, 7).

Jurisdiction of the Board is established by the evidence and is not challenged.

At the hearing, the following facts were established by substantial evidence:

The Union began organizing activities among respondents' employees in 1942. By October, 1943, 18 employees had joined the Union. Amos Leaf and Stanley Shaffer joined on July 17, 1942. Shortly thereafter, they were appointed stewards in the Union organization drive and a new Union Field Representative took over organizing activities at the plant.

Earl Sloan, a supervisor, in the summer of 1942, told Leaf and others "that they didn't need no union; they didn't want a union." Leonard Lennox, a foreman of maintenance told employee Warner that the Company did not approve of the Union. Hans Jorgensen, a leadman, told employee Mosher that the respondents "wouldn't stand for union activities" and that they "wouldn't stand" for a man belonging to the Union. Jorgensen was not a foreman. There were six men in the department. He laid out their work and had authority to criticize their work and to report derelictions to the foreman. Earl Marteleon, a foreman, in October, 1943, asked Leaf, "What is the idea of trying to organize my department?" Leaf replied that he was not trying to organize Marteleon's department, but the entire plant. Marteleon then said, "I don't want them to do me like they did O. C. Gossett. I have worked myself up to supervisor and I don't want them to take my authority away and lose all my seniority here just on account of a little union agitation. You remember when Gossett was on nights and he was foreman and had the union trouble, well, they * * * took his authority away and made him work in with another foreman and I don't want that to happen to me. The Company don't want a union here and it just puts me on the spot, because you are in my department." In October, 1943, Marteleon inquired of employee Cook if he (Marteleon) was the reason the Union wanted to get in. Marteleon told Leaf that the discharge of Shaffer in November, 1943, was due to the latter's Union activities. Harold Shearer, an assistant foreman in the Navy department, in 1943, asked Leaf how he was coming along with the Union. Leaf replied he was getting a few every day. Shearer then said, "I

---

[1] Hereinafter called the Board.
[2] Hereinafter referred to as respondents.

[3] Hereinafter called the Union.
[4] Hereinafter called the Act.

think you are bumping your head against a stone wall," because he had heard Lee Elder tell Tiny Ranum that he would have to work against the Union or he would not have a job. Shearer further told Leaf that respondents would get rid of him for his Union activities, and that he did not have a chance there. Employee Chappell heard Shearer, in the fall of 1943, apply a profane adjective to the Union and express the hope that it would not get in the plant.

Bennie A. Morton was employed by respondents on December 15, 1941. He joined the Union on July 17, 1942. On July 18, 1942, during the lunch hour, he distributed Union literature at respondents' plant and pasted stickers on a crane in the steel yard of respondents. At the end of the day's work on July 18, 1942, he was discharged.

Leaf was employed by respondents as a welder on August 17, 1941. He continued in that employment until January 24, 1944, when respondents discharged him.

In the course of his organizing activities in behalf of the Union, he secured application cards from approximately 30 employees.

In September, 1942, Leaf's draft classification was 1-A. He attempted to enlist in the Navy but was rejected because of a heart condition. He then took up the question of deferment with Nathan R. Kobey, respondents' attorney and advisor on labor matters. Kobey told him that respondents would seek a deferment for him if he would quit his Union agitation, that a union was not needed in the plant, and that any questions which arose could be best handled individually. Leaf told him if anything came up, he would talk to him individually and would forget about the Union. The respondents secured a deferment for Leaf and his classification was changed to 2-A. He received a second deferment in May, 1943. In September, 1943, Weiss told Leaf that he would seek another deferment for him. In October, however, after Leaf and Shearer started work on the Union organization drive, Kobey went to the plant, called Leaf to one side, and inquired, "What is all this agitation?" Leaf mentioned certain grievances. Kobey then told Leaf "he was off on the wrong foot trying to organize here," and that Leaf's draft classification as 2-B would be changed. In October, 1943, Weiss told Leaf, "We don't need no union here. You

are just away out of line on having a union in this plant." At the same time, Weiss advised Leaf that it had been reported to him that Leaf had made anti-semitic remarks. Weiss said to Leaf, "Don't you know you are just helping the Nazis trying to organize this plant? We don't need no union here." Leaf was reclassified as 1-A in November, 1943. On December 8, he discussed the question of deferment with Weiss. Thereupon, Weiss applied for another deferment, but warned Leaf that he should quit his Union agitation. Leaf was ordered to report for physical examination on January 18, 1944, and was rejected. On January 22, 1944, Leaf was called to foreman Marteleon's office where respondent Winter told him, "Well, we found out that you are not going to the Army and we don't need you around here. You are too much of a radical agitator." Leaf continued to work until the morning of January 24. Marteleon refused to sign his release slip, saying he did not want to get involved. The slip was signed by respondent Winter. It stated as the reason for the discharge: "Slanderous remarks in regard to his foreman." Leaf's foreman, Harold Sloan, was a single man and had been deferred three times. Sloan's deferment was the subject of adverse comment in the plant. It was reported to respondents that Leaf had called Sloan a slacker. Two employees undertook to discover the reason for Leaf's discharge. Jorgensen explained it to one of them by saying, "The Company would not stand for union activities." The other employee inquired of respondent Winter whether, "All our jobs are as insecure as Amos'," referring to Leaf. Winter said, "It is as secure as you yourselves will make it. * * * We want everybody to do his work and keep your mouth shut. That is all we ask of you. Your job is secure."

During the period of his employment by respondents, Leaf was a good worker and rendered satisfactory service. His initial wages were 75 cents per hour. In April, 1942, his wages were increased to 85 cents, in June, 1942, to 90 cents, in July, 1942, to 95 cents, and in September, 1943, to $1 per hour. The last raise was awarded for merit and ability as a crew leader.

Leaf denied that he called Sloan a slacker.

The Board found that respondents, by discriminating in regard to hire and tenure of Leaf, thereby discouraging membership

in the Union, had engaged in unfair labor practices within the meaning of § 8(3) of the Act, 29 U.S.C.A. § 158(3); and, by interfering with, restraining, and coercing their employees in the exercise of the rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157, had engaged in unfair labor practices within the meaning of § 8(1) of the Act, 29 U.S.C.A. § 158(1). The Board issued the usual cease and desist and reinstatement order.

Much of the evidence introduced by the Board was controverted by evidence introduced by the respondents.

 The weight of the evidence, the credibility of the witnesses, and the inferences reasonably to be drawn from the evidence, were matters to be determined by the Board and not by this court.[5]

In National Labor Relations Board v. Standard Oil Co., et al., 10 Cir., 124 F.2d 895, 903, we said:

"Section 10(e) of the Act, 29 U.S.C.A. § 160(e), provides: 'The findings of the Board as to the facts, if supported by evidence, shall be conclusive.' This 'means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. * * * Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." * * * It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' "[6]

Within the meaning of the foregoing requirements, we are of the opinion the evidence afforded substantial support for the Board's findings.

Respondents complain of the breadth of the cease and desist order. The respondents did not raise that question before the Board and the objection here comes too late.[7]

The order will be enforced.

---

[5] Swift & Co. v. National Labor Relations Board, 10 Cir., 106 F.2d 87, 93; National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 106, 62 S.Ct. 960, 86 L.Ed. 1305; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368; Consumers Power Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 38, 44.

In Swift & Co. v. National Labor Relations Board, supra [106 F.2d 93], we said:

"* * * the weight of the evidence and the credibility of the witnesses were for the determination of the trial examiner and the Board.

"* * * Likewise, the inferences to be drawn from the evidentiary facts are fact questions to be determined by the Board and a finding of inferential facts made by the Board will not be disturbed by the court, if warranted by the evidence, even though it permits of conflicting inferences."

[6] National Labor Relations Board v. Columbian E. & S. Co., 306 U.S. 292, 299, 59 S.Ct. 501, 83 L.Ed. 660; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; Continental Oil Co. v. National Labor Relations Board, 10 Cir., 113 F.2d 473, 481.

[7] 29 U.S.C.A. § 160(e); National Labor Relations Board v. Cheney California Lumber Co., 66 S.Ct. 553.