## NATIONAL LABOR RELATIONS BOARD
## v. CONTINENTAL OIL CO.

No. 3356.

Circuit Court of Appeals, Tenth Circuit.

Jan. 13, 1947.

Robert E. Mullin, of Washington, D. C. (Gerhard P. Van Arkel, Morris P. Glushien, A. Norman Somers, Marcel Mallet-Prevost and Barnard Morrison,, all of Washington, D. C., on the brief), for petitioner.

William H. Zwick, of Ponca City, Okl., for respondent.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This case is before us upon the petition of the National Labor Relations Board for enforcement of its order, issued against the Continental Oil Company, as authorized by Section 10(e) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. §§ 151 et seq., 160(e).

In pursuance of conventional proceedings the Board found and concluded that the Continental had interfered with, restrained and coerced certain of its employees in the exercise of their rights guaranteed by the National Labor Relations Act, in violation of Section 8(1) thereof.

The evidence on which the Board's findings and conclusions rest may be summarized as follows: Sometime during the latter part of April or the early part of May, 1944, a union organizer visited the Rincon Oil Field, near Rio Grande City, Texas, for the purpose of organizing Continental's employees. A meeting was held one evening in the yard of the Fain Drilling Company, at which between eighteen and twenty-five of Continental's employees were present. The advantages of the union were discussed and several employees filled out membership application cards.

About 10 o'clock the next morning "Farm Boss" Enyart notified the employees to attend a meeting in the company garage. At this meeting were two supervisory employees, and Superintendent Purswell, who took charge of the meeting. Employees testifying for the Board stated that Purswell told them he would like to know why the employees wanted to organize a union which was composed of "just a bunch of racketeering * * *" (using a vile epithet) interested only in collecting dues, and who could not do them any good; that if the employees went union, "it sure as hell would be union" and "things would be different". He stated that it would be better for the employees "to take out insurance policies instead of joining the union"; that by paying dues they were paying for their jobs and for some one else to tell them what to do. He related his own personal experience as a member of the union and the unsatisfactory results. Immediately after this meeting the employees dropped all efforts at self-organization. According to the testimony of employee Jackson "the employees were all kinda scared" after the garage meeting with Purswell.

Employee Cowan did not attend the meeting in the garage, but testified that a few days later Purswell asked him how he felt concerning the union, and what he knew about the two men who had been on the lease with the union organizer. He replied that he did not know anything about the two men except that they were looking for jobs, and Purswell stated "there's two * * *" (again using a vile epithet) "that are not going to work here". In January 1945 employee Tyler approached Purswell about a friend of his transferring to the Rincon Field. Purswell wanted to know about the friend's "feeling toward the union", stating he did not want any more "union agitators" around than he could help.

Sometime in February 1945, the employees again evidenced an interest in unionization. A meeting was scheduled to be held in Rio Grande City and employee Breeden testified that immediately before leaving the field to attend the meeting, Purswell told him "you better go in there and tell that bunch of goats to vote against the union". A majority of the employees attending the meeting voted to affiliate, and officers were elected.

All the employees appearing for the Board testified that immediately following

their affiliation with the union, Purswell's attitude toward them changed. Whereas he had formerly been friendly and had frequently gone hunting and fishing with them, he no longer was "neighborly and friendly" but avoided the employees and spoke only when forced to do so. Shortly after the meeting employee Tyler asked Purswell if he believed him to be a "union organizer or agitator". Purswell replied "Not necessarily", and asked why. Tyler told him it was because of his changed attitude. Purswell asked Tyler what the employees thought they would get out of the union. Tyler tried to explain that the men felt it might mean better jobs, a better understanding and some thought it would keep them from getting fired, and Purswell said "If any man here thinks it will keep him from getting fired if he belongs to the union, he is wrong".

About ten days after the meeting in Rio Grande City, Swearington told Purswell "If you or Mr. Conway are carrying any chips on your shoulders" because we have joined the union "You might as well get them off, because we don't have any hard feelings toward you". Purswell replied "It hurt me deeply that you boys went and joined the union without saying anything to me about it", and "From now on everything is going to go the straight and narrow; from now on, I will run this oil patch". Employee Cowan testified that before the employees joined the union they had "more or less a flexible working schedule" and were privileged to take time off for essential personal business, provided they worked the full eight hours a day. But, after the boys joined the union they were required to work a set shift of eight hours.

Employee Swearington testified that a few days after the union filed a charge of unfair labor practices, Purswell entered his office, threw a letter from the Board's Regional Director on his desk, and asked "Do you know anything about that? I understand you are secretary of that thing". When Swearington admitted his secretaryship and suggested that Purswell consult either the respondent or the President of the union about the letter, Purswell stated "Well, you dirty * * * dir-

ty * * *" (using the foulest of language) "What are you trying to do? Are you trying to push me into the river? * * * You are damned sure going to have to prove I have been discriminating against you".

On May 25, 1945, the Board conducted a consent election to determine whether respondent's employees desired union representation for the purpose of collective bargaining, and a majority of the votes cast were for the union. The day following the election the company garage, which in the past had been kept open at all times in order that the employees could service their cars in their free time, was locked at 5 o'clock, when the men quit work. The gate to the garage yard, where the air and water lines were located, was also locked and the employees were not only deprived of the garage facilities but the water and air lines, which had formerly been available at all times.

According to Purswell's testimony, he told the employees at the garage meeting that he wanted to talk to them about the union, but impressed upon them that their standing with Continental would not be affected whether they joined the union or not. He told them that the organizers made their living organizing the workers and he wanted each employee to weigh carefully what was said to them because "they might think they can do a lot for you that they can't. But go ahead and listen to them and then use your own heads". He called to their minds the days of the Ku Klux Klan, and how people would now be ashamed to admit their membership therein, and stated they should think it over very carefully before putting their name on a "ledger". He asked one employee how much it cost him to get and hold his job with Continental and when he replied that it did not cost him anything, Purswell stated "That is the American way of doing these things; that is the way it should be done. There should be no law or no fixed rule by any group whereby a man has to go out and buy or pay somebody for the privilege of earning a living for himself and his family".

Purswell stated that his primary purpose in calling the meeting was "the sincere

hope that the desired effects would be effected; that those fellows wouldn't organize and he wanted to let the boys know how he felt about their organizational efforts". He denied, however, telling Breeden that he must tell that "bunch of goats" to vote against the union, but stated that he did tell Breeden along with others that he wanted them to attend the meeting because he wanted full representation. He admitted his changed attitude toward the employees but attributed such change to the fact that the day after the boys joined the union they seemed embarrassed and quiet and he decided that he had better "play the same game", so he would walk by and never see them, but if one of them ever recognized him and spoke he never failed to speak. He denied making the abusive statements to employee Swearington, but stated that when he took the letter from the Regional Director into Swearington he said "I have an idea there is a penciled copy of that thing around here somewhere and * * * you are going to get a chance to prove that". He did not deny that the employees had been deprived of their "flexible shift", existent before they joined the union. He and the garage mechanic both testified that the garage was closed and the gate to the yard locked because some equipment and tools had disappeared, and that it was not the first time the garage and gate to the yard had been locked. However, both admitted that on other occasions when the garage had been locked they had left the key in a box near the entrance so the employees could use the facilities.

The respondent contends that the statements and conduct of Superintendent Purswell were no more than the exercise of his inalienable right to attempt to persuade the employees not to join the union; that there was no actionable coercion in his remarks or course of conduct—no restraint or interference with the right of self-organization, and the findings of the Board are therefore not supported by any substantial evidence.

The Board was of the opinion that Purswell's violent and opprobrious references to the union organizers carried implica-

tions of economic reprisals against those who chose to join the union. That his utterances and course of conduct amounted to an illegal use of his economic power over the employees, for which freedom of speech did not afford immunity.

Undoubtedly, the Board is the sole judge of the credibility of the witnesses and has the exclusive function of appraising conflicting and circumstantial evidence. It is also free to draw its own inferences from established facts and we are not warranted in drawing a different inference or taking a different view of the facts simply because they may be susceptible of such view or inference. In other words, if the facts are susceptible of more than one inference the Board's choice is not subject to review here. N.L.R.B. v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170; N.L.R.B. v. Nevada Consolidated Copper Corporation, 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305; N.L.R.B. v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; N.L.R.B. v. Denver Tent & Awning Co., 10 Cir., 138 F.2d 410; Harp v. N.L.R.B., 10 Cir., 138 F.2d 546; Boeing Airplane Co. v. N.L.R.B., 10 Cir., 140 F.2d 423; N.L.R.B. v. Winter, 10 Cir., 154 F.2d 719.

But, the problem of balancing the right of free speech by an employer against the employee's right to the free use of the same in matters of self-organization is essentially a judicial equation which we have the duty to resolve for ourselves. N.L.R.B. v. J. L. Brandeis & Sons, 8 Cir., 145 F.2d 556. And while the task of prescribing the boundary of free speech in the field of industrial relations, as in all other cases, is not an easy one, the necessity of reconciling competing interests within the framework of an organized society requires us to draw the line in the public interest.

"* * * 'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts. * * * Accordingly, * * * employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's

guaranty. * * *". Thomas v. Collins, 323 U.S. 516, 537, 65 S.Ct. 315, 326, 89 L.Ed. 430. See also N.L.R.B. v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; N.L.R.B. v. J. L. Brandeis & Sons, 8 Cir., 145 F.2d 556; Budd Mfg. Co. v. N.L.R.B., 3 Cir., 142 F.2d 922; Jacksonville Paper Co. v. N.L.R.B., 5 Cir., 137 F.2d 148; N.L.R.B. v. American Tube Bending Co., 2 Cir., 134 F.2d 993, 134 A.L.R. 1017. So long as persuasion does not amount to coercion it is within the guaranty, but no one has the constitutional right to interfere with, restrain or coerce another in the exercise of the same right. The use of economic power over men and their jobs to influence their action is more than the exercise of freedom of speech. Mere suggestions, when made by one who holds the power of economic coercion in a setting conducive to the exercise of that power, may have the unwarranted effect of exerting a coercive influence to which freedom of speech does not extend. N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 598, 61 S.Ct. 358, 85 L.Ed. 368.

It is important to consider that only twenty-five to thirty employees were involved in this organizational unit. Their relations to Superintendent Purswell were close and intimate. Purswell was the Boss of this particular "oil patch", and undoubtedly had economic power over their jobs, and hence to influence them in the exercise of their industrial freedom. Unquestionably Purswell was violently anti-union and did not attempt to conceal his attitude. We think the violent and profane language of Purswell, when considered in its proper setting, coupled with his course of conduct before and after the employees had joined the union, went beyond the realm of persuasion. It became coercive, or at least was intended to have that effect. It was intended not only to dissuade the employees from joining the union—it went further than that, it was designed to impress upon them that if they did join the union they would incur the retributive displeasure of their employer.

It follows that the Board's order should be, and is enforced.